Edward C. ABELL, Jr., et al.,
Plaintiffs–Appellees,

v.

POTOMAC INSURANCE COMPANY OF ILLINOIS, et al., Defendants,

Joe E. Fryar, Defendant–Appellant.

No. 90–4737.

United States Court of Appeals,
Fifth Circuit.

Nov. 13, 1991.

Rehearing Denied Dec. 11, 1991.

---

J. Minos Simon, Law Offices of J. Minos Simon, Lafayette, La., Guy E. Humphries, Jr., Humphries & Humphries, Alexandria, La., for Joe E. Fryar.

Judy Y. Barrasso, Kyle Schonekas, Phillip A. Wittmann, C. Lawrence Orlansky, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiffs-appellees.

Before KING, JOHNSON, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant-appellant Joe Fryar appeals the district court's judgment, which rejected his argument that the RICO statute is unconstitutionally vague and readjusted the amount of attorneys fees awarded to plaintiffs by $83,258.35. We affirm.

## I. BACKGROUND

### A. Facts

This court has already narrated the complicated facts of this case.[1] The following is a summary of the facts material to this appeal.

Westside Habilitation Center, Inc. ("Westside") is an alleged non-profit corporation based in Cheneyville, Louisiana. According to its developer and creator, Joe Fryar, Westside was conceived to be a home for the mentally retarded and actually became a home to severely mentally and emotionally-disturbed patients. Westside

---

1. *See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1109–13 (5th Cir.1988), *cert. granted and judgment vacated*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584(1989).

also became the means by which Fryar made lots of money.

On January 3, 1978, Fryar purchased 6.47 acres of land for the sum of $100,-000—the land's appraised value. Fryar then incorporated Westside in 1979. Although a five-member board of directors was appointed, Fryar continued to control Westside and made all of its decisions.

Fryar began Westside with no capital assets; Westside's sole source of revenue and assets was the sale of bonds. According to Fryar's plan, once established, Westside would rely on revenues paid by the State of Louisiana Medicaid program to finance operating expenses and retire these outstanding bonds.

To market his bonds and raise the needed capital, Fryar hired the nationally-known firm of Booz, Allen & Hamilton, Inc. ("B & A") to prepare a financial feasibility report for Westside. B & A did not reach the conclusions Fryar desired; their report raised several areas of concern.[2] Although Fryar did respond to B & A's report by changing his targeted clientele from mentally-retarded to emotionally-disturbed and mentally-retarded patients, Fryar also threatened B & A with a lawsuit because of its adverse conclusions. Confronted with the possibility of being sued, B & A did agree to sign a letter prepared by Westside's bond counsel, but Fryar was still left without a favorable feasibility report. Fryar ultimately procured a favorable report by retaining Real Estate Research Corporation, a firm primarily experienced in appraising real estate.

Despite Fryar's success in obtaining a favorable feasibility report, the Louisiana State Bond Commission declined to approve financing for Westside bonds. But Fryar again persisted and he eventually convinced the Town of Cheneyville to back a $12,850,000 municipal bond issue. Mysteriously, that bond authorization was later enhanced to $13,550,000.

So preparation of an offering statement for the sale of bonds began. Fryar now relied upon a number of professionals responsible for preparing the Westside bonds for market, including Wright, Lindsey & Jennings ("WLJ"), a Little Rock, Arkansas law firm.[3] WLJ prepared the bond offering and assumed strict "due diligence" duties; WLJ was responsible for carefully reviewing the final offering statement and for interviewing all key participants in the bond transaction. WLJ did not adequately investigate the bond transaction and failed to uncover details of how Westside acquired its facilities—the layered transaction responsible for this multi-million-dollar litigation:

(i) in 1978, Fryar bought the land eventually used to establish Westside for $100,000 ("the Land");

(ii) in 1981, Fryar helped to create All American, a Bermuda corporation controlled by Fryar;

(iii) also in 1981, Fryar then sold the Land to All American for $150,000, making an immediate 50–percent profit after owning the Land for three years;

(iv) in 1982, All American sold the Land to Westside for $2,479,000 (more than fifteen times what All American originally paid)—$479,000 in cash and the remaining $2,000,000 in tax-exempt municipal Westside bonds; and

(v) All American retained its ownership interest in the bonds but allowed Fryar

---

**2.** B & A's report highlighted:

(1) the possibility that the state medicaid program would impose ceilings on medicaid reimbursements; (2) the difficulties Westside would encounter in retiring its debt, since it depended entirely upon medicaid reimbursements and lacked adequate sources of working capital; and (3) the inherent faults of the Westside concept in a state whose prevailing policies required placing Westside's potential patients in group homes.
858 F.2d at 1110.

**3.** Fryar also relied upon: Joseph Hancock and his underwriting firm, Hancock, Joseph & Daniels; Skye, Westside's attorney; Peck, whose firm of Peck, Shaffer & Williams continued to serve as bond counsel; Robert Sheddy of Swink & Co., the other underwriter for the bond issue; and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo—a Boston law firm that was then counsel for the two underwriters. Mintz, Levin resigned as underwriter's counsel just a few weeks before Westside's scheduled closing of its bond deal with the underwriters, and the underwriters immediately hired WLJ.

to pledge them as security for his performance of duties as developer of Westside—enabling Fryar to later claim that he had over $2,000,000 of his own money at risk in Westside.

The offering statement WLJ prepared contained no information regarding the B & A report, contained no mention of the fact that Fryar had once owned the Land, and flatly reported that Fryar had pledged $2,000,000 of Westside bonds to the project's success—suggesting that Fryar had pledged *his own* money.

Westside and its underwriters closed their bond deal on April 20, 1982. The underwriters subscribed to the entire issue of bonds and undertook the task of selling, which they did quickly and without difficulty.

Then the facts began to publicly surface. A local newspaper caught wind of the Land transaction, began to dig, and further unearthed its details. Also, a bank failure and delays cost Westside some $300,000, and resulting litigation forced Swink & Co., the underwriter for the bond issue, to send a reassuring letter to all bondholders. That letter, dated January 20, 1983, finally revealed information wrongfully withheld from the offering statement.

This lawsuit was initiated on behalf of a class of 500 Westside bondholders on July 5, 1984. In October, Westside's financial structure crumbled: Westside defaulted on an interest payment on its bonds and in

March of 1985 was forced to file Chapter XI bankruptcy.

The Bondholders did not fare well in bankruptcy and are now entitled to interest payments considerably lower than promised. As of December 8, 1986, the time this case first went to trial, All American had made $2,950,000 from the land transaction and interest payments it received from Westside bonds; the bondholders had lost more than $12,000,000.[4]

## B. *Proceedings*

This action was commenced on July 5, 1984, by Edward C. Abell, Jr. and Carey Walton, individually and on behalf of the class of purchasers of Westside bonds, for (i) violations of federal and state securities laws, (ii) state law fraud, and (iii) RICO.[5] According to plaintiffs, Fryar fraudulently caused Westside to issue $13,550,000 in tax-exempt revenue bonds, which ultimately defaulted and inflicted millions of dollars in losses on bondholders. Following a nine-week trial, a jury returned a verdict for plaintiffs on all counts, and judgment was entered on February 19, 1987. The jury awarded plaintiffs $12,096,866.80 in damages, including $2,550,000 for RICO violations and $2,567,323.80 in attorneys' fees.

On appeal, this court affirmed the district court's judgment on plaintiffs' RICO claims and affirmed the RICO award in favor of plaintiffs, holding that "the jury awarded plaintiffs considerably less than the damages which they proved at trial."[6]

---

**4.** According to plaintiffs, related transactions also enhanced Fryar's wealth at the bondholders' expense:

> [Fryar] submitted reimbursement claims to the State of Louisiana Medicaid program which misrepresented the true cost of the facility, the obligations of Westside and the fact that the bondholders were not being paid the interest owed. As a result of these misrepresentations, Fryar received payments from the state of Louisiana Medicaid program substantially in excess of what should have been paid. More importantly, Fryar pocketed the money paid as reimbursement on debts to the bondholders, thereby profiting personally by an amount in excess of $1,300,000.

Brief of Appellees Edward C. Abell, Jr. and Carey Walton, Individually, and as Representatives of the Class of Purchasers of Westside Habilitation Center Revenue Bonds at 16–17,

*Abell v. Potomac Ins. Co. of Ill.*, No. 90–4737 (filed Apr. 30, 1991) ["Appellees' Brief"].

**5.** More specifically, plaintiffs invoked section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*(1), (2); section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68; the Louisiana Securities Law, La.Rev.Stat.Ann. § 51:714 (West 1987); and provisions of Louisiana substantive law regarding fraud, breach of fiduciary duty, and negligent misrepresentation.

**6.** *Abell*, 858 F.2d at 1140. This court actually affirmed the district court in part, reversed in part, and remanded by holding that:

> (1) bond counsel and person whose corporation issued the bonds were not "sellers" for

This court did, however, order the district court to readjust the attorneys' fees award to compensate plaintiffs only for the resources which they expended to develop a case against Fryar and All American.

Fryar filed a Petition for Certiorari to the United States Supreme Court on March 13, 1989, arguing that plaintiffs had failed to establish distinct multiple schemes and that they had, therefore, failed to establish a pattern of racketeering activity. On July 3, 1989, the United States Supreme Court granted petitions for certiorari in nine cases, including this one, in which the issue of sufficiency of a pattern of racketeering activity was raised.[7] In light of the Supreme Court's decision discussing the appropriate standard for establishing a pattern of racketeering activity under RICO,[8] the Court systematically remanded the nine cases on this issue decided prior to *H.J.* for reconsideration.

On September 12, 1989, this court then remanded the matter back down to the district court for further consideration in light of *H.J.* and Fryar's pending bankruptcy proceeding.[9] Plaintiffs moved for reinstatement of the jury's RICO verdict and the award of attorneys' fees, and Fryar moved to dismiss plaintiffs' RICO claims, arguing for the first time that the RICO statute is unconstitutionally vague.

The district court granted plaintiffs' motion, upholding the jury's verdict in light of *H.J.* and rejecting Fryar's argument that RICO is unconstitutionally vague.[10] In accordance with this court's instruction, the district court readjusted the amount of attorneys' fees awarded plaintiffs, reducing

the award to $2,359,177.42; the district court concluded that $83,258.35 worth of time was spent litigating claims against the law firm WLJ, which this court absolved of liability.

Judgment was entered on September 5, 1990, reaffirming the jury's RICO verdict and entering the adjusted award of attorneys' fees. It is from this judgment that Fryar now appeals.

## II. DISCUSSION

This case is before us once again for reconsideration in light of *H.J.*—the Supreme Court's effort to walk onto a site of interpretive confusion and construct a standard for establishing what constitutes a "pattern of racketeering activity" under RICO. *See generally H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J.,* where customers of a telephone company alleged that the company had been bribing state officials to gain approval for excessive telephone rates, the Court reversed the district court's judgment granting defendants motion to dismiss. The Court held that "RICO defines bribery as a 'racketeering activity,' 18 U.S.C. § 1961(1), so petitioners have[, as required under RICO,] alleged multiple predicate acts", and the Court reversed the district court on the ground that "petitioners may be able to prove that the multiple predicates alleged constitute 'a pattern of racketeering activity,' in that they satisfy *the requirements of relationship and continuity.*" *Id.* at 250, 109 S.Ct. at 2906 (emphasis added). Beyond showing the commission of at least

---

purposes of the Securities Act or the Louisiana Blue Sky law; (2) statements were shown to be material; (3) plaintiffs could not use *Ute* presumption of fraud on the market theory to show reliance by class; (4) plaintiffs did not show any reliance on statements made by bond counsel; (5) bond counsel could not be held liable on breach of fiduciary duty or other theories with respect to nonclients; (6) attorneys were not vicariously liable; (7) plaintiffs established RICO violation by developer whose corporation issued the bonds; (8) plaintiffs were not limited to out-of-pocket damages; and (9) developer did not show that he was prejudiced by jury's knowledge of his attempt to bribe one juror.

*Id.* at 1104.

7. *See Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

8. *See H.J. Inc. v. Northwestern Bell Tel. Co., Inc.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

9. *See Abell v. Potomac Ins. Co.,* 884 F.2d 196 (5th Cir.1989); *In re Joe E. Fryar,* Docket Number 89–BK–80595–11 (Bankr.W.D.La.1989).

10. *See Abell v. Potomac Ins. Co.,* No. 84–1786, Ruling at 1–5 (W.D.La. Aug. 2, 1990) ["Ruling"].

two predicate offenses on a specified list,[11] *H.J.*'s prescription for a "pattern of racketeering activity" calls for a showing "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphasis in original).

Along with these relatedness and continuity requirements, the Court introduced tests to establish their presence. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412–13 (3d Cir.1991). For relatedness, the Court adopted a broad multifactor test that turns on whether the alleged predicate acts " 'are interrelated by distinguishing characteristics and are not isolated events.' " *H.J.*, 492 U.S. at 240, 109 S.Ct. at 2901 (quotation omitted). As for continuity, the Court noted that proof of multiple schemes is "highly relevant" to the question of continuity but not a prerequisite,[12] and defined continuity as "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. As was recognized by the Court, these tests are highly fact- and case-specific. *See id.* at 237, 242, 109 S.Ct. at 2899, 2902; *Kehr Packages*, 926 F.2d at 1412–13.

Exercising the opportunity provided by *H.J.*, appellant has returned to this court with three questions of law in hand: (a) whether the provisions of the RICO statute, 18 U.S.C. §§ 1961, *et seq.*, and in particular 18 U.S.C. § 1961(5), are unconstitutionally vague in violation of the procedural due process guarantees of amend. V to the U.S. Const.; (b) alternatively, whether the uncontested facts in this case constitute proof of "a pattern of racketeering activity" within the meaning of the RICO statute as interpreted and applied; and (c) whether this court should substantially reduce or eliminate altogether the attorneys' fees awarded plaintiffs. To fully address these questions, we will consider each of them individually.

## A. *Fryar's Constitutional Challenge*

■ When we remanded this case to the district court for consideration, we did so with an explicit mandate: "This cause is REMANDED to the district court for further consideration in light of *H.J. Inc.* The district court shall also consider the appropriate disposition of this matter in light of the pending bankruptcy proceeding."[13] We did not lower a piñata of issues for Fryar to split open, returning to this court with his arms full.

The *H.J.* opinion scripted by Justice Brennan and delivered by the Court is actually an effort to overcome RICO ambiguity—and, therefore, add constitutional undergirding to the statute—by establishing a "pattern of racketeering activity" standard for RICO. *See generally H.J.*, 492 U.S. at 229, 109 S.Ct. at 2893. Fryar has not constructed his constitutional challenge to RICO from the holdings of *H.J.* Rather, he has pulled his argument out of the *H.J.* concurrence by Justice Scalia, from which he quotes in his brief at length.[14] *See, e.g.*, Original Brief of Defendant–Appellant Joe E. Fryar at 19–21, *Abell v. Fryar*, No. 90–4737 (5th Cir. filed Apr. 1, 1991) ["Appellant's Brief"]. The gist of Justice Scalia's *concurrence* is captured in the following excerpt:

> Today, four years and countless millions in damages and attorneys' fees later (not to mention prison sentences under the criminal provisions of RICO), the Court does little more than repromulgate those hints as to what RICO means, though with the caveat that Congress intended

---

11. This list has been codified at 18 U.S.C.A. §§ 1961(1), (5) (1984 & Supp.1991).

12. *See id.* 492 U.S. at 240, 109 S.Ct. at 2901.

13. *Abell*, 884 F.2d 196.

14. Fryar is certainly not the first to raise a vagueness challenge to RICO with citations to Justice Scalia's concurrence; others have also tried and failed. *See, e.g., United States v. Glecier*, 923 F.2d 496, 497 n. 1 (7th Cir.1991); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.1991); *United States v. Pungitore*, 910 F.2d 1084, 1104–05 (3d Cir.1990); *United States v. Angiulo*, 897 F.2d 1169, 1179–80 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

that they be applied using a "flexible approach."

\* \* \* \* \* \*

Today's opinion has added nothing to improve our prior guidance, which has created a kaleidoscope of circuit positions, except to clarify that RICO may in addition be violated when there is a "threat of continuity." It seems to me this increases rather than removes the vagueness.

*H.J.*, 492 U.S. at 251, 255, 109 S.Ct. at 2907, 2908 (quoted in Appellant's Brief at 20–21).

The force of Justice Scalia's concurrence and the fact that it was joined by the Chief Justice and Justices O'Connor and Kennedy—all currently members of a Court that has changed its composition since deciding *H.J.*—do add a thick coat of lacquer to appellant's argument. Nevertheless, the scope of the Supreme Court's remand is narrow, and we only proceed to the outer edge of the Court's *H.J.* holdings—despite the efforts of appellant to entice us beyond. *See Robinson v. Ariyoshi*, 854 F.2d 1189 (9th Cir.1988). Cautiously aware that we are standing on that edge, we now consider Fryar's constitutional contention.

First, this court cannot simply overlook the fact that Fryar has waited six years after the commencement of this case, four years after a nine-week jury trial resulting in a jury verdict in favor of plaintiffs, and two and one-half years after this court affirmed the judgment on plaintiffs' RICO claims to launch his constitutional attack on the RICO statute. Justice Scalia's concurrence did not *create* the alleged constitutional problems with RICO, and the Supreme Court did not pull *H.J.* out of a jurisprudential vacuum.[15] "Untimely" is, therefore, an understatement. *See Minpeco, S.A. v. Hunt*, 724 F.Supp. 259, 260 (S.D.N.Y.1989) (defendants criticized for first asserting constitutional challenge to RICO after trial and disposition of post-trial motions).[16]

Still, let us take one step more and consider the substance of Fryar's constitutional challenge. Fryar notes that a statute is unconstitutionally vague when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,"[17] and goes on to argue that:

> Certainly, if the justices of the Supreme Court, the circuit judges sitting on the various Courts of Appeals and the district court judges are unable to discern the meaning of "pattern of racketeering activity" from 18 U.S.C. §§ 1961, et seq.,

---

**15.** In fact, the Court constructed *H.J.* from a bulky body of caselaw discussing the elements necessary to establish RICO liability—including the continuity requirement. *See, e.g., Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (discussing elements regarding "pattern of racketeering activity."); *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc) (rejecting multiple scheme requirement: two or more interrelated acts with showing of continuity or threat of continuity is sufficient), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989); *United States v. Jennings*, 842 F.2d 159 (6th Cir.1988) (two predicate acts are potentially enough); *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36 (3d Cir.1987) (rejecting multiple scheme requirement: adopting case-by-case multifactor test); *Sun Sav. and Loan Ass'n. v. Dierdorff*, 825 F.2d 187, (9th Cir.1987) (requiring two predicates, separate in time, which are not isolated events); *Roeder v. Alpha Indus.*, 814 F.2d 22, 30 (1st Cir.1987) (to establish "pattern," not enough that racketeering acts constitute two or more: "The constituent elements must be sufficiently related to one another and threaten

to be more than an isolated occurrence."); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925 (10th Cir. 1987) (holding single-objective scheme with no threat of continuity insufficient); *Bank of Am. Nat'l Trust & Sav. Ass'n. v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986) (requiring that predicates be interrelated).

**16.** The facts in *Minpeco, S.A. v. Hunt*, 724 F.Supp. 259, 260 (S.D.N.Y.1989), are precisely on point with the facts before us. Consider that court's holding:

> [I]n spite of the interest created in the legal profession by the challenging remarks contained in Justice Scalia's concurrence, and although he spoke for three other Justices, his concurrence does not constitute a formal development of the law which would justify declaring the statute unconstitutional at this stage of the exhaustive proceedings in this case.

*Id.* at 260.

**17.** *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *see also* Appellant's Brief at 19.

then men of common intelligence must necessarily guess at its meaning and differ as to its application.

Appellant's Brief at 22.[18]

In bringing his constitutional contention to us, Fryar is apparently overlooking the principle that "outside the First Amendment context, a party has standing to raise a vagueness challenge only insofar as the statute is vague as applied to his or her specific conduct." *United States v. Pungitore,* 910 F.2d 1084, 1104 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2010, 114 L.Ed.2d 98 (1991); *see also United States v. Angiulo,* 897 F.2d 1169, 1179 (1st Cir.1990) (in absence of First Amendment considerations, vagueness challenge must be examined in light of a case's particular facts), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). For his vagueness challenge to succeed, Fryar would have had to show this Court that the scope of RICO's "pattern" element was so unclear that a person of ordinary intelligence in Fryar's position would not have had adequate notice that his actions constituted a "pattern of racketeering activity." *See id.* at 1179. A myriad of fraudulent acts spanning more than six years and involving more than five hundred victims—based on the evidence adduced at trial, it follows that Fryar's *facial* attack on the constitutionality of RICO is simply too superficial to accept.[19]

## B. Fryar's Nonconstitutional RICO Challenge: The Question of Continuity

■ A "Pattern of racketeering activity" is a necessary element for establishing the "prohibited activities" that trigger RICO liability. *See* 18 U.S.C.A. §§ 1961, 1961(5) (1984 & Supp.1991). As noted by Justice Scalia, it is also the cause of "the widest and most persistent circuit split on an issue of federal law in recent memory." *H.J.,* 492 U.S. at 251, 109 S.Ct. at 2906–07.

Although our opinion has been vacated by the Court's systematic remand of nine cases on the issue now again before us, this court has already affirmed the judgment for plaintiffs' RICO claims against Fryar for the activities in question, noting that "the evidence *strongly* supports the jury's RICO verdict." 858 F.2d at 1130 (emphasis added). *H.J.* has, if anything, resolved rather than revolutionized the law, and the *Fryar* facts have not changed.[20]

RICO defines mail fraud as a "racketeering activity."[21] Mail was the means by

---

**18.** More specifically, Fryar argues that:

> Clearly, 18 U.S.C. § 1961(5) does not set forth a definition or notice of what constitutes a "pattern of racketeering activity." Instead, the statute *only* sets forth a minimum necessary condition for the existence of such a pattern. 18 U.S.C. §§ 1961, et seq., does *not* contain any other provision relating to the essential element of a "pattern of racketeering activity."

Appellant's Brief at 11 (emphasis in original).

**19.** *See generally Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1109–13 (5th Cir.1988); *id.* at 1130:

> Here, plaintiffs alleged that Fryar had repeatedly used the mails to execute a scheme to sell Westside bonds with the intent of defrauding the purchasers. The record amply supports the jury's conclusion that Fryar, intending to defraud potential investors, devised and employed a scheme to sell Westside bonds. Fryar knowingly misled prospective bondholders about a land transaction that significantly affected Westside's financial structure. He falsely suggested that he had backed the health-care project with $2,000,000 of his own money. Obviously, the jury could find that Fryar had a reasonably calculated plan to

deceive persons of ordinary prudence and comprehension into giving Westside their money.

> Nor does Fryar contest whether he used the mails repeatedly to execute this scheme; indeed, the evidence is overwhelming that he did. Fryar used the mails to obtain and transmit the application forms for Westside's certificate of need; to help create All American and interpose it in the transaction; and to send the land transaction documents to All American. He also caused others to use the mails to transmit the sales circulars that erroneously portrayed Fryar as purchasing and pledging $2,000,000 of bonds with his own money; and finally, he caused the mails to be used in an attempt to cover up the fraud and deceive bondholders into believing All American was performing more obligations than it had actually undertaken. Thus, the evidence strongly supports the jury's RICO verdict.

**20.** *See supra* notes 15 and 19.

**21.** 18 U.S.C.A. section 1961(1)(B) (1984 & Supp. 1991) states that "'racketeering activity' means any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud)."

which Mr. Fryar, among other things, carried out his infamous land transaction.[22] For example, in 1981 and 1982, the mails were used to (i) create All American, (ii) set up All American as the purchaser of Fryar's land, (iii) carry out a sale of that land to Westside for fifteen times what All American originally paid for it, and (iv) to transmit sales circulars that deceptively portrayed Fryar as purchasing and pledging $2,000,000 in bonds paid for with his own money.

The essence of the Court's *H.J.* holding is that:

> RICO's legislative history ... establishes that Congress intended that to prove a "pattern of racketeering activity" a plaintiff or prosecutor show both "relationship" and "continuity"—that the racketeering predicates are related, and that they either constitute or threaten long-term criminal activity.

492 U.S. at 230, 109 S.Ct. at 2896 (citation omitted). According to Fryar, rather than being related and continuous, his criminal acts were isolated and sporadic.[23] The district court, applying the principles of *H.J.*, disagreed:

> The Court agrees with plaintiffs that the relatedness requirement is met because the activities all stem from Westside's bond offer were directed to a common purpose or goal (to defraud the investors and enrich Fryar) and had the same victims (the plaintiff-bond holders).

\* \* \* \* \* \*

> Continuity is established by proving that defendant engaged in "a series of related predicates extending over a substantial period of time" evidencing a threat of continuity. This may be shown by, *e.g.*, establishing that (1) "the related predi-

cates themselves involve a distinct threat of long-term racketeering activity"; (2) "the predicate acts or offenses are part of an ongoing entity's regular way of doing business"; or (3) "the predicates are a regular way of conducting or participating in an ongoing and legitimate RICO 'enterprise.'"

Ruling at 2–3, *quoting H.J.*, 492 U.S. at 229, 109 S.Ct. at 2893 (citations omitted); *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412–13 (3d Cir.1991) (discussing how to satisfy tests for establishing relatedness and continuity).

*H.J.*'s relatedness and continuity tests are fact-specific,[24] and the facts adduced at trial and piled up high against Fryar—some 500 bondholders cheated out of millions of dollars in a scheme that spread itself out over more than six years—are damning. We have no need to sharpen our pencils for subtle RICO analysis: Fryar's mail fraud violations and the fact that these violations were, as observed by the district court, strung together by the making-money-at-the-expense-of-bondholders objective realized by Fryar are enough. Fryar's conduct has, therefore, easily surpassed the RICO threshold, and we affirm the district court's RICO judgment against him.

## C. The Question of Attorneys' Fees

 In our opinion vacated by the Supreme Court, we absolved the law firm of WLJ of liability and ordered the district court to compensate plaintiffs only for legal resources expended to develop their case against Fryar and All American.[25] The district court obliged, reducing the attorneys' fees awarded against Fryar by $83,258.35.[26] Now Fryar asks us to do that again, pleading "that the district court did

---

22. Discussed *supra* at Part I.A.

23. Appellant's Brief at 23:

> In particular, plaintiffs failed to produce any evidence of racketeering activities engaged in by defendant that amounted to or threatened long-term criminal activity, i.e., the "continuity" requirement for proving the existence of a "pattern of racketeering activity." Instead, plaintiffs were only able to show that appellant Fryar engaged in isolated and sporadic

criminal acts related to the Westside bond offer.

24. *See id.* 492 U.S. at 237, 242, 109 S.Ct. at 2899, 2902; *Kehr Packages*, 926 F.2d at 1412–13.

25. *See* 858 F.2d at 1142.

26. Ruling at 4–6 (reduction based upon review of fee applications numbering 143 pages and reflecting thousands of individual work entries).

not delineate and differentiate the professional activities of plaintiffs' counsel as to all of the defendants ..." [27]

Where time spent on unsuccessful issues is difficult to segregate, no reduction of fees is required. *See Riverside v. Rivera,* 477 U.S. 561, 569–74, 106 S.Ct. 2686, 2691–93, 91 L.Ed.2d 466 (1986); *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). Therefore, we only need deduct for fees incurred solely in developing claims against WLJ.

Having thoroughly reviewed the record, we agree with appellees:

> little time was spent solely developing claims against WLJ for trial. With the exception of the legal malpractice claim, the same claims asserted against WLJ were asserted against Fryar.... Even if WLJ had not been a defendant, proof if its involvement nevertheless was required to rebut defenses of reliance on counsel and that the loss resulted from the actions of others.[28]

Fryar has already received a significant reduction in the attorneys' fees awarded against him. Had he substantiated that a larger portion of the legal fees incurred by plaintiffs were spent on developing claims solely against defendant WLJ, Fryar would probably have received a greater reduction.[29] In the absence of such substantiation, we affirm the judgment of the district court.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

27. Appellant's Brief at 35.

28. Appellees' Brief at 42.

29. The brief Fryar submitted to this court is, to say the least, thin on this point. The most he has to offer us is that the case began with 12 defendants and "[a]t trial appellant Fryar, Wright, Lindsey & Jennings and All American Service Company, Ltd. remained as defendants, plaintiffs having settled by compromise their claims against the other defendants." Appellant's Brief at 32–35. This is simply not enough to raise reservations regarding the district court's determination.