**Thomas ALTER, individually and as assignee, Lee Schlessman, as assignee, and Bank of Denver, Plaintiffs,**

**v.**

**DBLKM, INC., f/k/a Kirchner, Moore & Company, Kutak, Rock & Campbell, Colorado Springs–Stetson Hills Public Building Authority, Amwest Development I Limited Partnership, Amwest Development Corporation, Gregory D. Timm, and one or more John and/or Jane Doe(s) and/or Doe Entity(ies), Defendants.**

**Civ. A. No. 90–M–1981.**

United States District Court, D. Colorado.

Dec. 20, 1993.

Kenneth C. Groves, John S. Butcher, Kenneth C. Groves, P.C., Denver, CO, Rodney R. Patula, Pryor, Carney & Johnson, P.C., Englewood, CO, for plaintiffs.

Jeffrey A. Chase, Edwin P. Aro, Holme Roberts & Owen, Denver, CO, James C. Ruh, John V. McDermott, Byrne Ruh & McDermott, P.C., Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, Judge.

Defendants DBLKM, Inc. ("DBLKM"), Kutak, Rock & Campbell ("Kutak"), AmWest Development I Limited Partnership ("AmWest I") and AmWest Development Corporation ("AmWest Corp.") moved pursuant to F.R.Civ.P. 12(b)(6) to dismiss plaintiffs' second amended complaint alleging claims for relief under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, the civil liability provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, the Colorado Organized Crime Control Act (COCCA), C.R.S. §§ 18–17–101 to –109, and

Colorado common law fraud and civil conspiracy. This court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state statutory and common law claims under 28 U.S.C. § 1367(a).

The plaintiffs' second amended complaint sets out the following factual basis for their claims. The Colorado Springs–Stetson Hills Public Building Authority, (the "Authority"), issued Series 1986A bonds ("1986 bonds") to raise $15,000,000 to finance improvements in the 2,200 acre Stetson Hills subdivision in Colorado Springs, Colorado. The Authority issued Series 1988A bonds (1988 bonds) to raise an additional $11,000,000. The 1986 and 1988 bonds were part of the first phase of a three-phase plan to raise a total of $45,000,000 to develop Stetson Hills over 10 to 15 years. The Authority was managed by a limited partnership, AmWest I, the developer and owner of Stetson Hills. The general partner in AmWest I was AmWest Corp.. Gregory Timm ("Timm") served as a director of the Authority, director and president of AmWest Corp., as well as general counsel for both AmWest Corp. and AmWest I. Dain Bosworth, Inc. was the lead underwriter for the 1986 bonds. Smith Barney Harris Upham & Co., Inc., and DBLKM, then known as Kirchner, Moore & Company, also underwrote the 1986 bonds. DBLKM was the lead underwriter for the 1988 bonds. Central Bank of Denver served as trustee for both series of bonds. Kutak served as bond counsel for the 1986 issue, and bond and special disclosure counsel for the 1988 issue. Neither series of bonds was rated and they were not traded on any exchange.

Payment on principal and interest was to be from assessments against land within Stetson Hills—totalling approximately 250 acres for the 1986 bonds and 273 acres for the 1988 bonds. The indenture between the trustee and the Authority, an assessment and lien agreement between the Authority and AmWest I, and a development agreement between AmWest I and the trustee defined the obligations of the parties involved in the bonds' issuance. Two principal covenants are material here: The "110% test" required the Authority to maintain assessment charges against the land equal to or greater than 110% of the outstanding bond principal. The second covenant, called the "160% test," required AmWest I to maintain an assessment lien against property with a discounted bulk sale value equal to 160% of the outstanding principal of the bonds. AmWest I was required annually to provide an appraisal to the trustee as evidence of compliance with these covenants. The covenants provided that if the 160% test was not being met, AmWest I would subject additional land in Stetson Hills to the assessment lien.

The plaintiffs and their assignors purchased 1986 bonds at prices at or near par value in the secondary market concurrent with, or just after, the initial offering of the 1988 bonds. Plaintiff Thomas Alter ("Alter") purchased 1986 bonds with a face value of $100,000 on June 8, 1988. Alter is also the assignee from 34 other secondary market purchasers of the 1986 bonds. Plaintiff Lee Schlessman ("Schlessman") is the assignee of two bondholders who purchased 1986 bonds with a face value of $40,000 in January and February 1989. Plaintiff Bank of Denver purchased 1986 bonds with a face value of $120,000 in July and August of 1988 and January of 1989. The trustee gave notice on March 15, 1989 that a technical default had occurred on the 1986 bonds and that the Authority had failed to provide an updated appraisal of the property securing the bonds. After that notice of default, the secondary market for the 1986 bonds has collapsed.

Plaintiffs allege that these purchases of 1986 bonds resulted from a fraudulent scheme involving all of the defendants. In essence, the plaintiffs contend that if adequate disclosure concerning the status of the 1986 bonds had been made in 1988, the 1988 bonds could not have been issued and there would not have been a secondary market for the 1986 bonds. The plaintiffs also contend that DBLKM manipulated the market by buying 1986 bonds at or near par value and then reselling them through other brokers. Plaintiffs contend these prices were artificially inflated because in June and December 1987 the trustee had to invade the reserve fund to make interest payments and the Authority failed to submit the required apprais-

al for the trustee to verify compliance with the "160% test."

The official statement for the 1988 bonds, dated May 20, 1988, was nearly identical to the 1986 statement. Plaintiffs, however, allege that it left out material information, including: that AmWest I was going to use $2,000,000 from the 1988 bonds to purchase more land so that the 1986 bonds would remain secured; that the Authority was in default on the 1986 bond covenants; that the value of the land securing the 1986 bonds had been questioned by the trustee; that Dain and the trustee had questioned the reliability of the appraisals done to comply with the 1986 bond covenants; that the trustee had requested an independent review of the appraisal; and that Kutak and AmWest I decided to delay the independent appraisal review until after the initial marketing of the 1988 bonds.

Plaintiffs allege DBLKM also omitted these material facts in a May 5, 1988 presentation to bond professionals and in subsequent solicitations of bond brokers and potential purchasers. Plaintiffs allege they relied on the information dispensed in relation to the 1988 bonds in making their respective decisions to purchase the 1986 bonds. Plaintiffs also claim to have relied on the market price of the 1986 bonds being close to par value as evidence that the bonds were a secure investment. Plaintiffs claim the misinformation and concealment in the 1988 official statement contributed to the artificial inflation of the market price of the 1986 bonds.

The defendants' motions to dismiss assert that the plaintiffs are unable to show reliance on the 1988 bond issue in the purchase of the 1986 bonds in the secondary market.

## I. 15 U.S.C. § 78j(b) and Rule 10b–5

Rule 10b–5 reads:

It shall be unlawful for any person ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circum-

stances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. Reliance is an essential element of a Rule 10b–5 cause of action. *Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). The plaintiffs contend that reliance is not a problem in this case because they are entitled to a presumption under one or more theories advanced by them. The courts have recognized that certain circumstances will support a presumption or inference of reliance without direct evidence.

Two of plaintiffs' asserted theories of reliance are not applicable. Neither the "fraud-on-the-market," nor the "fraud-created-the-market" theories of reliance are supported by the allegations in this case.

■ The fraud-on-the-market theory is based on the premise that the price of a security in an open, developed and efficient market is determined by the use of all available public information regarding the issuer by all who are involved in the market. Accordingly, any fraudulent representation or omission will taint the price to the damage of buyers or sellers regardless of their personal knowledge or reliance. *Basic,* 485 U.S. at 241–242, 108 S.Ct. at 988–89. The fraud-on-the-market theory requires showing that the security was traded in large volume during the time period at issue, that a significant number of securities' analysts followed and reported on the security and that the price changed in relation to public statements or reports about the activities of the issuer. *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989).

■ Plaintiffs have made no such allegations here. To the contrary, they and their assignors purchased the 1986 bonds in a thin, undeveloped secondary market. The second amended complaint makes one conclusory allegation as to the market being "open, developed and sufficiently efficient to be responsive to the truth concerning the value of the

land securing the 1986 bonds." (second amended cmplt. ¶ 66). Such conclusory parroting of the legal requirement has been rejected elsewhere, *see Greenberg v. Boettcher & Co.,* 755 F.Supp. 776, 782 (N.D.Ill.1991), and is similarly rejected here. There are no allegations which would support a finding that the purchases made by the plaintiffs and their assignors were at prices inflated by a fraud-on-the-market.

■ Similarly, plaintiffs cannot avail themselves of the fraud-created-the-market theory of reliance. Fraud-created-the-market is based on the theory that investors rely not on the integrity of the market price, but on the integrity of the market itself. *Shores v. Sklar,* 647 F.2d 462, 470 (5th Cir.1981), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Ross v. Bank South, N.A.,* 885 F.2d 723, 729 (11th Cir.1989) (*en banc*), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990). So far, the theory has only been applied to initial offerings of securities. See *Shores, supra* at 464; *Ross, supra* at 726; *T.J. Raney & Sons v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330, 1333 (10th Cir.1983) *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1110 (5th Cir.1988). This is because the initial price offering of a security is arbitrarily determined, and, as the Tenth Circuit put it, "at a minimum" purchasers should be able "to assume the securities were lawfully issued." *T.J. Raney, supra* at 1333.

The fraud-created-the-market theory of reliance is not universally accepted. Following the lead of the Fifth Circuit in *Shores,* the Tenth and Eleventh Circuit Courts of Appeals have recognized fraud-created-the-market. *T.J. Raney,* 717 F.2d at 1330; *Ross v. Bank South, N.A.,* 885 F.2d at 729. Meanwhile, the Sixth and Seventh Circuit Courts of Appeals have repudiated it. *Freeman v. Laventhol & Horwath,* 915 F.2d 193 (6th Cir.1990); *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1130 (7th Cir.1993). In rejecting the fraud-created-the-market theory, the Seventh Circuit described the theory as having a false premise:

Federal securities law does not include "merit regulation." See *The Business Roundtable v. SEC,* 905 F.2d 406 (D.C.Cir. 1990); § 23 of the '33 Act, 15 U.S.C. § 77w. Full disclosure of adverse information may lower the price, but it does not exclude the security from the market. Securities of bankrupt corporations trade freely; some markets specialize in penny stocks. Thus the linchpin of *Shores*—that disclosing bad information keeps securities off the market, entitling investors to rely on the presence of the securities just as they would rely on statements in a prospectus—is simply false.

*Eckstein v. Balcor Film Investors,* 8 F.3d at 1131.

Of course, *T.J. Raney* is guiding precedent for this court. There, the court held the plaintiff could recover through a showing that the securities he bought were issued in violation of applicable law. The court said:

Federal and state regulation of new securities at a minimum should permit a purchaser to assume that the securities were lawfully issued. This holding does not imply in any way that the regulatory body considers the worth of the security or the veracity of the representations made in the offering circular....

717 F.2d at 1333. The Tenth Circuit's test explicitly denies that fraud-created-the-market allows reliance on the price at which the security traded as an indicator of its quality. The fraud-created-the-market approach presumes reliance when the fraud is so egregious that no investor would have purchased the security if the truth were known.

The fraud and misrepresentations pleaded by plaintiffs here are not so egregious. Certainly the 1986 bonds would have sold far below par value had full disclosure been made. But the 1986 bonds were not worthless, illegally issued, or so riddled with fraud that no investors would have purchased them in 1988. Furthermore, a key to all fraud-created-the-market claims is that the securities are fraudulent and not entitled to be brought to the market at all. The 1986 bonds had already been issued and were purchased on the secondary market. This fact alone makes the fraud-created-the-mar-

ket presumption inapplicable to this case. In light of the tenuous vitality of this fraud-created-the-market theory, and the marked factual distinctions between the cases in which it has been applied and this case, plaintiffs will not be allowed to proceed with the benefit of this theory.

■ Plaintiffs may be able to prove actual reliance on misrepresentations and omissions for some purchases. If that actual reliance involved defendants' omissions, and not just misrepresentations, then the presumption of reliance articulated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), would apply. Also pleaded are facts allowing plaintiffs to proceed on their allegations of complex fraud, entitling them to the presumption used in *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

■ The second amended complaint reads: "[p]laintiffs and many of their assignors relied directly or indirectly on the [1988] official statement or oral communications …" made by defendants. second amended cmplt. ¶ 57. In preceding paragraphs, plaintiffs set forth specific facts of what was misrepresented or omitted from the 1988 official statement and oral communications made during the sales' solicitations. If DBLKM made the misrepresentations alleged in the complaint to those who sold to the plaintiffs or their assignors, actual reliance will be established.

■ Actual reliance for a case against Kutak depends upon the extent that its opinion letter issued June 16, 1988 was considered relevant to the value of the 1986 bonds. It and the other defendants may also be liable for their complicity in the fraudulent acts of DBLKM.

■ That complicity, if proved, will also support the plaintiffs' claim of complex fraud under *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *Schlick* obviates the need to prove reliance when defendants' misrepresentations or omissions are collateral to a larger fraudu-

lent scheme. In *Schlick*, the plaintiffs alleged that defendants acquired a company as part of a multifaceted scheme to drain its assets. After draining the assets, defendants allegedly issued false proxy materials to deflate the stock value and then engage in a favorable stock swap in effecting a merger. The Second Circuit said that if the alleged fraudulent conduct were confined to the alleged misstatements in the proxy statement, then a claim could not be sustained for want of transaction causation, or reliance. *Id.* at 380. Nevertheless, the court allowed plaintiffs to proceed under Rule 10b–5 without proof of reliance when the complaint contained allegations of "a scheme to defraud which includes market manipulation and a merger on preferential terms, of which the proxy omissions and misrepresentations are only one aspect." *Id.* at 381.

■ The correlate complex fraud alleged in this case is that DBLKM's issuance of the misstated and incomplete 1988 official statement was collateral fraud to a broader market manipulation scheme evidenced by DBLKM's repurchase of 1986 bonds to create a market for the 1988 bonds. It is contained in paragraph 49 of the second amended complaint:

> Beginning in May 1988 Kirchner engaged in manipulation of the market for the 1986 Bonds in part to create a market for the 1988 Bonds. In order to sell the 1988 Bonds, Kirchner purchased 1986 Bonds from certain of its customers, which it then sold at prices close to par through its sole shareholder Drexel Burnham Lambert and through other retail brokers. The price indicated to plaintiffs and their advisors that the 1986 Bonds were a good and reasonably safe investment.

While the allegation of market manipulation principally concerns actions of DBLKM, the other defendants may be liable under the "complex fraud" theory—either as principals, aiders and abettors, or co-conspirators.

Distilled to its essence, plaintiffs have pleaded a Rule 10b–5 case based on defendants' knowledge and failure to disclose the default on the 1986 bond covenants and de-

clining value of the collateral for the 1986 bonds. When combined with the allegations of defendants engaging in a scheme of price manipulation to support the market for the 1988 Bonds, claims based on actual reliance and complex fraud have been sufficiently pleaded to survive defendants' motion to dismiss.

Of uncertain application to this case is the *Affiliated Ute* presumption of reliance. To avail themselves of the *Affiliated Ute* presumption of reliance, plaintiffs must plead that defendants omitted, not just misrepresented, material information and that the defendant owed the plaintiff a duty to disclose. *Grubb v. Federal Deposit Insurance Corp.*, 868 F.2d 1151, 1163 (10th Cir.1989). Issues of defendants' alleged omissions must predominate over issues involving affirmative misrepresentations for the presumption of reliance to apply. *Id.*

The availability of the presumption turns on the taxonomic distinction of whether this is a case about omissions or about misrepresentations. This distinction is made with the underlying purpose of the *Affiliated Ute* presumption in mind. *Affiliated Ute* did not vitiate the reliance requirement, rather it is a concession to the difficulties plaintiffs' encounter in proving reliance in a case involving primarily omissions. *Holdsworth v. Strong*, 545 F.2d 687, 695 (10th Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). Accordingly, "[*Affiliated Ute*'s] underlying rationale does not logically apply in a case in which the 'omissions' are the type that can be said to exist only because of other, positive statements that the [defendant] has made." *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 409 (N.D.Ill.1984).

The application of the *Affiliated Ute* presumption to this case would come in combination with proof of actual reliance on DBLKM or Kutak's representations, and depends on the exact nature of those representations. The presumption, therefore, cannot categorically be dispensed from this case. Its application awaits further clarification of what representations were, or were not, made and what specifically plaintiffs' looked to in making their decisions to purchase the 1986 bonds. For instance, if in making their purchasing decisions plaintiffs and their assignors did not actually rely on the 1988 official statement, then the *Affiliated Ute* presumption will not apply. *See Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981). On the other hand, if there was actual reliance on the 1988 official statement and the defendants did omit material information, then the *Affiliated Ute* presumption will be available.

■ The defendants respectively urge that they owed no duty of disclosure to plaintiffs. A failure to disclose material information is actionable only when a party is under a duty to do so. *Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Insurance Corporation*, 805 F.2d 342, 347 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relationship of trust and confidence between them. *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), *citing*, Restatement (Second) of Torts § 551(2)(a) (1976). Since the defendants had different relationships to plaintiffs, they must be considered separately.

■ DBLKM protests that finding it had a duty of disclosure to plaintiffs would amount to "an extraordinary expansion of the disclosure duty of participants in the bond underwriting process." DBLKM reply at 3. DBLKM asserts that it had no duty of disclosure to plaintiffs because it never sold the bonds to plaintiffs, and it did not have a fiduciary relationship with plaintiffs.

Plaintiffs allege DBLKM manipulated the market for the 1986 bonds to create a market for the 1988 bonds by buying up 1986 bonds at prices near par value, with knowledge of the failure to comply with the requirements of the 1986 bonds. These actions by DBLKM, plaintiffs claim, induced them to purchase the 1986 bonds. Under *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 857–60 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 101 (10th Cir.1971), *cert. denied*, 404 U.S.

1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), these allegations suffice to create a duty and state a claim.

By disseminating the official statement for the 1988 bonds, DBLKM assumed a duty of full and truthful disclosure. Plaintiffs' allege the 1988 official statement made reference to the 1986 bonds and failed to apprise purchasers of the true status of the 1986 bonds. These statements triggered DBLKM's duty to plaintiffs.

■ Law firm liability for Rule 10b–5 violations turns on this: If the firm issued a misleading bond opinion letter for dissemination to third parties, then a Rule 10b–5 claim can be pursued against the firm; on the other hand, if liability is premised on the law firm's failure to breach attorney-client confidences and 'tattle' on its client, then a 10b–5 claim has not been alleged. Put another way, *Chiarella* protects an attorney's silence in the face of a client's misrepresentations, but once the attorney joins in making the misrepresentations a duty of truthfulness and full disclosure applies.

■ As bond and special disclosure counsel for the 1988 issue Kutak assumed a duty of disclosure to the purchasers of those bonds. As disclosure counsel, Kutak issued an opinion letter dated June 16, 1988 that stated:

> We have considered the information contained in the [1988] official statement and ... nothing has come to our attention which leads us to believe that the Official statement ... contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; ...

The letter is addressed to the underwriters, DBLKM and Hanifen, Imhoff, Inc.. Yet if investors would foreseeably rely on this letter, plaintiffs state a claim against Kutak. *Ackerman v. Schwartz*, 947 F.2d 841, 849 (7th Cir.1991). In *Ackerman*, the court reversed and remanded the dismissal of a 10b–5 claim against an attorney finding that the attorney could be liable to the extent he allowed the promoters of a fraudulent tax shelter to release his legal opinion letter to potential investors. Thus, to the extent that Kutak's disclosure letter for the 1988 bonds was meant for third-party dissemination, and not just for the underwriters, a duty is triggered. As Kutak points out, plaintiffs do not specifically allege that this disclosure letter was intended for third-party dissemination. Nevertheless, the same was true in *Ackerman*. The opinion letter there was addressed only to the promoters of the scheme, but the court held it should go to jury as to whether the letter was meant for dissemination as part of the promotion of the tax shelter. Similarly, here the disclosure letter for the 1988 bonds could have triggered a duty of disclosure if the letter was meant for potential investors.

■ Finally, all of the moving defendants, insofar as they were involved in the scheme to make a market for the 1988 bonds can be said to have assumed a duty under *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d at 857–60, and *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d at 101. If the 'complex fraud' scheme did indeed take place, defendants' actions would have sent signals to the market for which they could be held responsible.

The duty to disclose cases relied on by defendants do not really extend to the scope of misrepresentations and manipulation that plaintiffs are alleging. *Chiarella* and *Windon Third* are concerned with instances where parties were silent about material information, and whether they had an affirmative duty to speak based on a special relationship to the plaintiffs. Plaintiffs' allegations here go beyond those "silence" cases to allege that defendants affirmative misstatements induced the bond purchases involved in this case. The Rule 10b–5 claim cannot be dismissed for want of a duty of disclosure.

## II. RICO and COCCA claims

Plaintiffs' RICO claims are brought under 18 U.S.C. §§ 1962(b), (c), and (d) which read:

**Prohibited Activities**

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any

enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any for any person to conspire to violate any of the provisions of subsections (a), (b) or (c), of this section.

The Colorado Organized Crime Control Act claims, brought under C.R.S. § 18–17–104(2), (3) and (4), are similar, but not identical, to the proscriptions of RICO:

**18–17–104. Prohibited activities.**

(2) It is unlawful for any person, through a pattern of racketeering activity ... to knowingly acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3) It is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity....

(4) It is unlawful for any person to conspire or endeavor to violate any provisions of subsection (1), (2), or (3) of this section.

The Supreme Court in *Reves v. Ernst & Young,* 507 U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), held that a defendant must participate in the operation or management of an enterprise before a RICO claim can be maintained under 18 U.S.C. § 1962(c). In acknowledgment of this, and the respective capacities of DBLKM and Kutak, plaintiffs now admit their claims are brought only under 18 U.S.C. §§ 1962(b) and (d) and C.R.S. §§ 18–17–104(2) and (4).

With this concession, two issues remain: first, whether plaintiffs have alleged a pattern of racketeering having sufficient relatedness and continuity; and, second, whether RICO and COCCA are constitutionally void for vagueness. COCCA is modeled on RICO and construed in the same manner as RICO.

*New Crawford Valley, Ltd. v. Benedict,* 1993 WL 87830, (Colo.App.1993); *Benson v. People,* 703 P.2d 1274, 1276 (Colo.1985); *Plains Resources, Inc. v. Gable,* 782 F.2d 883, 888 (10th Cir.1986).

■ To state a claim under RICO, and its state law correlate COCCA, plaintiffs must allege a "pattern of racketeering activity" of sufficient relatedness, and that poses a sufficient threat of continuity. *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). Predicate acts are of sufficient relatedness if they have "same or similar purposes, results, participants, victims or methods of commission, otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (citation omitted).

■ The continuity requirement involves an examination of the temporal aspect of the alleged predicate acts. A RICO claim can either consist of a "close-ended" pattern of activity or an "open-ended" pattern. *Id.* at 241–242, 109 S.Ct. at 2901–02. A close-ended pattern of racketeering refers to a series of related predicate acts extending over a substantial period of time concluded by the time the RICO action is brought. "Predicate acts extending over a few weeks or months and threatening no future conduct do not satisfy [the continuity] requirement: Congress with RICO was concerned with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. Courts have not set a bright-line as to how much time is a "substantial period of time." Nevertheless, the Third Circuit has noted that it never found such a period where the racketeering activity occurred over the period of one year or less. *United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992). The predicate acts alleged in plaintiffs' complaint extend at most over 6 to 7 months from January 1988 when defendants first received notice from John Conrad at Dain as to problems with the appraisal, to June or July 1988 by which time defendants had issued the official statement, supposedly begun manipulation of the bond market for 1986 bonds and made oral representations about the 1988 bonds. This is not a long enough period to state a close-ended RICO claim. *See Mar-*

*shall—Silver Construction Co. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990) (seven months not enough for close-ended pattern); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (eight months not enough); *Azurite Corp., Ltd. v. Amster & Co.,* 730 F.Supp. 571, 580–81 (S.D.N.Y.1990) (seven months not enough for close-ended scheme).

■■■ The complaint does contain conclusory allegations that the predicate acts began in 1986, but these are not pleaded with the particularity that is required by F.R.Civ.P. 9. At most, plaintiffs allege actions in 1986 and 1987 amounting to breach of the 1986 bond covenants. This is not a racketeering activity defined by § 1961(1). Without any predicate acts prior to 1988, the pattern that plaintiffs strive to make out in their complaint only lasted for 6 or 7 months. Accordingly, no close-ended RICO or COCCA violation has been pleaded.

■■■ An open-ended pattern involves a series of predicate acts which by their nature indicate the likelihood of continuing criminal activity. *H.J., Inc.,* 492 U.S. at 241, 109 S.Ct. at 2901. Thus, under an open-ended theory, related predicate acts extending over only a short period of time can support a RICO claim so long as they indicate a threat of future criminal activity. *Morrow v. Black,* 742 F.Supp. 1199, 1207 (E.D.N.Y.1990). That said, racketeering predicates which take place pursuant to a specific business transaction lasting only a few months are not evidence of a specific threat of continuity. *Continental Realty Corp. v. J.C. Penney,* 729 F.Supp. 1452 (S.D.N.Y.1990).

■■■ The focus then is whether the complaint alleges facts which evince enough of a threat of continuing illegality that an open-ended RICO violation has been alleged. Plaintiffs rely on three allegations in their complaint as stating a claim: first, defendants contemplated a series of bond offerings to finance Stetson Hills; second, that Kutak and DBLKM would engage in similar financing transactions in the future; and, third, that a 1989 letter from DBLKM to bondholders advising them of problems with the Stetson Hills appraisals suggested the real estate market might "turn around."

The complaint reveals not so much that defendants' manipulation of the market for the Stetson Hills bonds was part of a scheme to issue undercollateralized bonds, as a response to a collapse in the real estate market and attempts by defendants to keep the subdivision project alive. Thus, the fact that defendants contemplated a series of bond issues for Stetson Hills does not indicate a threat of continuing activity because the Authority's default on the 1986 bonds ended the opportunity. There are no allegations that the type of actions DBLKM and Kutak allegedly engaged in here extend beyond the particular circumstances of the Stetson Hills bonds, or any indication that they would duplicate such actions in other bond transactions. Finally, the 1989 letter from DBLKM to bondholders expressing the hope that the real estate market might "turn around" does not evince a continuing threat of racketeering activity. It is not a predicate act.

Plaintiffs' bare allegations that defendants will engage in future similar conduct will not suffice to state a RICO claim. These allegations are tied to no specific facts and are nothing more than repeating the Supreme Court's language in *H.J., Inc.* See *Elliot v. Foufas,* 867 F.2d 877, 880 (5th Cir.1989) (RICO claim dismissed where "allegations substantially rescript the language of the statute in conclusory form"). In *H.J., Inc., supra,* the Court overturned the district court's motion to dismiss, partially because "a threat of continuing racketeering activity might be established at trial by showing that the alleged bribes were a regular way of [defendant's] conducting ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise." *Id.* 492 U.S. at 250, 109 S.Ct. at 2906. Here, however, the alleged enterprise has collapsed. An open-ended RICO violation has not been alleged.

Because of the conclusion that plaintiffs fail to state a RICO claim, the court will not respond to defendants' invitation to strike down the RICO claims as "void for vagueness" as applied in this case. For better or worse, federal courts have been loath to declare RICO constitutionally void for the vagueness of its statutory prohibitions. *See,*

for instance, *Abell v. Potomac Insurance Co.,* 946 F.2d 1160, 1165–67 (5th Cir.1991); *but see, H.J., Inc.,* 492 U.S. at 255–256, 109 S.Ct. at 2908–09 (Scalia, J., concurring).

### III. Common law fraud

■ Rule 10b–5, of course, is a specific federal securities law correlate of common law fraud. The difference is that substitute theories of reliance are not available under the common law; a plaintiff must prove actual reliance as an essential element of a fraud claim. *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458, 462 (1937). Accordingly, a common law fraud claim has been pleaded against defendants. Plaintiffs will have to prove actual reliance on the alleged misrepresentations to succeed on the fraud claim, and will be without the benefit of any substitute theories of reliance.

### IV. Civil Conspiracy

A civil conspiracy claim consists of: two or more persons or entities; an object to be accomplished; a meeting of minds on the object or course of action; one or more unlawful overt acts; and damages as a proximate result thereof. *More v. Johnson,* 193 Colo. 489, 568 P.2d 437, 439–40 (1977). Plaintiffs have pleaded a claim for civil conspiracy. The allegations of market manipulation, suppression of the Stetson Hills appraisals, and publication of misrepresentations in the 1988 official statement suffice as unlawful overt acts. The object of this manipulation is adequately encompassed by defendants' desire to market the 1988 bonds. While a meeting of minds is alleged in the complaint *pro-forma,* this element of the claim is the most elusive to plead and to prove. The civil conspiracy claim must remain against all defendants.

Upon the foregoing, it is

ORDERED that defendants motions for summary judgment are DENIED as to the Rule 10b–5 claims. Defendants' motions to dismiss are GRANTED as to the RICO and COCCA claims. The motions to dismiss the common law fraud and civil conspiracy claims are DENIED.