Howard ROSENTHAL and Rudy L. and Judy J. Bettmann, on behalf of themselves and all others similarly situated, Petitioners/Cross–Respondents,

v.

DEAN WITTER REYNOLDS, INC.; Frank B. Walker; Jack A. Vickers, III; William B. Graham; and Kutak Rock & Campbell, Respondents/Cross–Petitioners,

and

Castle Pines Land Company, Helen McMaster Coulson, and Larry Reichert, Respondents.

No. 94SC403.

Supreme Court of Colorado, En Banc.

Dec. 18, 1995.

Rehearing Denied Jan. 29, 1996.

Vinton Nissler Allen & Vellone, P.C., Patrick D. Vellone, Denver, Spector & Roseman, P.C., Eugene A. Spector, Paul J. Scarlato, Debra M. Kahn, Philadelphia, Pennsylvania, for Petitioners/Cross–Respondents.

Brega & Winters, P.C., Charles F. Brega, Thomas D. Birge, Cathryn B. Mayers, Denver, for Respondent/Cross–Petitioner Dean Witter Reynolds, Inc.

Kerr, Friedrich, Brosseau, Bartlett, L.L.C., Andrew J. Friedrich, Denver, for Respondents/Cross–Petitioners Frank B. Walker, Jack A. Vickers, III, and William B. Graham.

Kutak Rock, Diana C. Fields, Denver, Patrick Griffin, Omaha, Nebraska, for Respondent/Cross–Petitioner Kutak Rock & Campbell.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Merrill Shields, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Regulatory Law Section, Denver,

for Amicus Curiae Philip A. Feigin, Securities Commissioner for the State of Colorado.

Justice SCOTT delivered the Opinion of the Court.

A seller's misrepresentations or omissions of material fact, deceptive practices, or fraudulent acts in connection with the sale of a security are actionable under section 11–51–125(2) of the Securities Act of 1981. Pursuant to our grant of certiorari,[1] we must determine the pleading requirements sufficient to overcome a C.R.C.P. 12(b)(5) motion to dismiss. We also address the standing requirements of section 11–51–127(1).

## I

In 1986, petitioners, Howard Rosenthal, Rudy L. Bettmann, and Judy J. Bettmann (purchasers) bought securities, general obligation municipal bonds,[2] issued by the Castle Pines North Metropolitan District (District). The District is a quasi-municipal corporation and a political subdivision of the state, located within the southern suburbs of and "with easy accessibility" to the City and County of Denver. It was organized for the purposes of providing for the construction of water, sanitary sewer, and street improvements within its approximately 1,603 acres of land located in Douglas County, Colorado.

The District offered its municipal bonds for sale under an Official Statement dated July 17, 1986, raising gross proceeds of $38,-170,000. A primary purpose of the offering was for refunding, in advance of maturity, the District's General Obligation Bonds, Series 1984, issued in the aggregate principal amount of $22,000,000. In February 1990, the District began encountering financial difficulties. In September 1990, a bondholders meeting was called because "there [were] not sufficient funds available for full payment to bondholders of bond payments scheduled to be made on December 1, 1990." On November 14, 1990, the District filed for bankruptcy.

In July of 1991, Howard Rosenthal filed a securities fraud class action complaint in the District Court of Douglas County against: (1) Castle Pines Land Company (the "Land Company"), the primary developer of the District; (2) Frank B. Walker, Jack A. Vickers, III, Helen McMaster Coulson, William B. Graham, and Larry Reichert, the elected directors for the District; (3) Dean Witter Reynolds, Inc. (Dean Witter), the "Broker" or underwriter;[3] (4) Kutak Rock & Campbell (Kutak), bond counsel for the 1986 bond issuance; and (5) Sherman & Howard (Sherman), disclosure counsel to the District.[4] Specifically, Rosenthal alleged that the defendants, in issuing the general obligation bonds for the District, violated sections 11–51–123(1) and 11–51–125(2), 4B C.R.S. (1987), repealed by ch. 82, sec. 1, §§ 11–51–101 to –802, 1990 Colo. Sess. Laws 700, and recodified as amended at §§ 11–51–501 and 11–51–

1. Our order granting certiorari set forth the following issues:
   1. Whether the Colorado Court of Appeals erred in affirming the district court's dismissal of the fraud claims of municipal bond purchasers by improperly interpreting the pleading requirements of § 11–51–123 of the Colorado Securities Act.
   2. Whether the court of appeals erred in adopting the fraud-created-the-market doctrine as a substitute for pleading actual reliance under the anti-fraud provisions of the Colorado Securities Act of 1981.
   3. Whether the Colorado Securities Act of 1981, as set forth in § 11–51–127(1), applies to a securities purchase when both the offer and sale take place outside the state of Colorado. We use the title "Securities Act of 1981" in this opinion.

2. The municipal bonds consisted of eight percent Castle Pines North Metropolitan District General Obligation Refunding Bonds, Series 1986 A, issued in the amount of $20,590,000, and eight percent Castle Pines North Metropolitan District General Obligation Improvement Bonds, Series 1986 B, issued in the amount of $17,580,000.

3. The Securities Act of 1981 defines a "Broker" as "any person engaged in the business of effecting transactions in securities for the account of others," § 11–51–102(2)(a), here, the purchasers and the District. If, in fact, Dean Witter purchased the securities from the District and sold them for its "own account," Dean Witter is a "Dealer." § 11–51–102(2)(b). Although defined under the federal statutes, the Securities Act of 1981 does not define the term "underwriter."

4. The District was not named as a defendant due to the automatic stay provisions of the Bankruptcy Code. Other defendants were named in the initial complaint, but were dismissed.

604, 4B C.R.S. (1995 Supp.). The class action complaint was filed on behalf of a class consisting of all persons and entities, other than the defendants, who purchased the District's general obligation bonds, Series 1986 A and B, between the date of the offering and the date the District filed for bankruptcy. In November 1991, the Bettmanns were added as named plaintiffs.

The purchasers' complaint alleged that the defendants conspired to and did "issue[ ] material misstatements and information which they knew or had reason to know were false and misleading, and omitted to state material facts necessary to make those statements not misleading." First Am. Class Action Compl. ¶ 63. In addition to these misstatements and omissions, purchasers alleged that "defendants ... initiated and/or joined in a course of conduct which was designed" and intended to: (1) deceive the investing public regarding the Land Company's prospects for completion of the planned development and the District's ability to make payments on the 1986 bonds; (2) introduce the bonds into the market although the bonds were "otherwise not entitled to be marketed"; (3) cause class members to purchase or acquire the 1986 bonds at inflated prices; and (4) permit the Land Company to continue its development activities and to profit from the sale of land to other developers and of homes to individual purchasers. Id. ¶ 15. The purchasers alleged that the defendants' misstatements and omitted material facts caused them financial injury. Id. ¶¶ 69, 79, 86.

The alleged misstatements and omissions appeared in or were omitted from the preliminary Official Statement and the definitive Official Statement dated July 17, 1986.[5] The Official Statement, seventy-eight pages long with its addenda in final form, was prepared by or disseminated to the investing public by the defendants. The Official Statement, the principal selling document for the sale of the District's municipal bonds, described: (1) the District, the municipal bonds offered for sale, and its governing body; (2) the development of the Castle Pines community, including private home construction; and (3) the basis by which the District would meet its payment obligations on the municipal bonds.

In addition, purchasers alleged that defendants made misstatements and omitted material facts in "press releases, and presentations to the investing public." Id. ¶ 19. The Official Statement also included " 'cautionary' language" specifically indicating "[i]t is difficult to predict the rate at which future development ... may occur." However, purchasers alleged the Official Statement portrayed "a positive scenario" regarding the District's "ability to make payment on the 1986 Bonds," even if "there were insufficient funds collected from ... taxes levied on District property." Id. ¶¶ 44, 45.

Purchasers alleged that the defendants misstated that "proceeds from [the offering] in the amount of $19,488,039.66 and certain other funds of the District in the amount of $8,034,805.91 were to be deposited" in escrow and used "to pay the principal and interest required" on the municipal bonds. Id. ¶ 51. Purchasers claimed investors were led to believe funds "would be available to make payment." Id. ¶ 52. Yet, "[a]s of October 3, 1990 there was approximately $912,000 available for payment of the December 1, 1990 payment on the 1986 Bonds (the total repayment required was $3,535,612.00)." Id. ¶ 58. Finally, among other allegations, purchasers claimed that, although defendants stated that $22,000,000 of the proceeds would be used to "pay-off the 1984 Bonds" before maturity, "defendants failed to adequately disclose" that the reason for such prepayment "was because the District was experiencing undisclosed financial problems which would, and did, materially affect payment on the 1984 Bonds." Id. ¶ 63(c).

Defendants Walker, Vickers, Graham, Dean Witter, Kutak, and the Land Company immediately filed motions to dismiss. The district court granted the motions in part and dismissed portions of the complaint pursuant to C.R.C.P. 12(b)(5), holding that the purchasers failed to sufficiently allege reliance on the defendants' misstatements or material omissions of fact.[6] In a later order, the court

---

5. We refer to the two statements collectively as the "Official Statement."

6. In its order dated February 4, 1992, the district court stated:

denied class certification, holding that the Securities Act of 1981 did not apply to plaintiff Rosenthal's claims because Rosenthal, a resident of the Commonwealth of Pennsylvania, did not purchase his bonds in Colorado. The district court, pursuant to C.R.C.P. 54(b), directed the entry of a final judgment on the C.R.C.P. 12(b)(5) dismissal and on the order denying class certification. The court of appeals affirmed the dismissal in part, reversed in part, and remanded with directions for reconsideration of the class certification. *Rosenthal v. Dean Witter Reynolds, Inc.*, 883 P.2d 522, 526–29 (Colo.App. 1994).

The court of appeals concluded that the "fraud-created-the-market" doctrine "should be imported into Colorado law." *Rosenthal,* 883 P.2d at 526. However, the court of appeals held that the complaint did not sufficiently allege reliance because: (1) the doctrine of fraud-created-the-market, while available, was inapplicable because the purchasers improperly pleaded its elements, *id.* at 526–28; and (2) the *Affiliated Ute* presumption did not apply because the purchasers pleaded primarily misstatements rather than omissions. *Id.* at 528–29. The court of appeals also held that Colorado law applied to Rosenthal's claims and that the statute of repose did not bar the Bettmanns' claims. *Rosenthal,* 883 P.2d at 529–32. Accordingly, the court of appeals remanded the case for reexamination of class certification. *Id.* at 532.

Purchasers claim the court of appeals erred: (1) in interpreting the pleading requirements of sections 11–51–123 and 11–51–125(2) of the Securities Act of 1981; and (2) in failing to properly apply the fraud-created-the-market doctrine. Respondents claim the court of appeals erroneously determined that the Securities Act of 1981 applies to Rosenthal's securities purchase. We reverse in part, affirm in part, and remand to the court of appeals with directions that it return the case to the trial court with instructions that the trial court vacate its order dismissing purchasers' claim under sections 11–51–125(2) and 11–51–123(1) and for further proceedings consistent with this opinion.

II

■ We view with disfavor a C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim and uphold a trial court's grant of such a motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Dunlap v. Colorado Springs Cablevision, Inc.,* 829 P.2d 1286, 1291 (Colo.1992) (citation and internal quotation marks omitted). We review the grant of a motion to dismiss using the same standards as the district court and "accept all averments of material fact contained in the complaint as true." *Shapiro & Meinhold v. Zartman,* 823 P.2d 120, 122–23 (Colo.1992). C.R.C.P. 12(b)(5) motions " 'are rarely granted under our "notice pleadings." ' " *Dunlap,* 829 P.2d at 1291 (quoting *Davidson v. Dill,* 180 Colo. 123, 131, 503 P.2d 157, 162 (1972)).

■ Under our standard of review, allegations in the complaint "must be viewed in the light most favorable to the plaintiff." *Id.* Also, "[i]t is fundamental that, in passing upon a motion to dismiss a complaint, the court can consider only matters stated therein and must not go beyond the confines of the pleading." *McDonald v. Lakewood Country Club,* 170 Colo. 355, 360, 461 P.2d 437, 440 (1969).

■ The chief function of a complaint is to give notice to the defendant of the transaction or occurrence that is the subject of

Judicial authorities construing federal securities acts are highly persuasive in interpreting and applying relevant portions of the Colorado Securities Act; accordingly, the court should look to the decisions of federal courts when deciding defendants' motions.

....

Reliance is an element of [purchasers'] claims under section 11–51–123(1) of the Colorado Securities Act (Count 1), the claim under common law for negligent misrepresentation (Count 3), and the claim under common law for fraud (Count 4).

The district court then held that "[i]nasmuch as ... [purchasers] cannot establish reliance under either the *Affiliated Ute* [*Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)] standard or the fraud created the market doctrine, their Complaint fails to state claims for relief under section 11–51–125(2)," and dismissed those portions of the complaint.

plaintiff's claims. *Kluge v. Wilson,* 167 Colo. 526, 528–29, 448 P.2d 786, 787 (1968). Such a complaint should not be dismissed on motion for failure to state a claim so long as the pleader is entitled to some relief " *'upon any theory of the law.'* " *Hinsey v. Jones,* 159 Colo. 326, 329, 411 P.2d 242, 244 (1966) (emphasis added by *Hinsey* court) (quoting *Weick v. Rickenbaugh Cadillac Co.,* 134 Colo. 283, 289, 303 P.2d 685, 688 (1956)). Under that standard, we now turn to the Securities Act of 1981 and the plain language of the applicable statutes that informs our review.[7]

### III

### A

■ Section 11–51–125(2) of the Securities Act of 1981 provides:

> Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11–51–123 is liable to the person buying or selling a security in connection with the violation for such legal or equitable relief which the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

Section 125(2) creates an express private right of action. *Noland v. Gurley,* 566 F.Supp. 210, 215 (D.Colo.1983); Cathy Stricklin Krendl, *The Securities Act of 1981: A Reduction in Duplicate Regulations,* 10 Colo. Law. 2158, 2170–71 (1981). Section 11–51–123(1) provides:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud;

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Although we have previously held that federal precedent is persuasive in construing similar language in our securities laws, *People v. Riley,* 708 P.2d 1359, 1363 (Colo.1985), we should first look to the plain language of the controlling statutes under our law.[8] When construing a Colorado securities statute, we employ fundamental principles of statutory construction before resorting to case law regarding similar federal law. A statute should be construed so we give full effect to the intent of the legislature. *United Blood Servs. v. Quintana,* 827 P.2d 509, 522 (Colo. 1992); *Gallegos v. Phipps,* 779 P.2d 856, 861 (Colo.1989); *Charnes v. Boom,* 766 P.2d 665, 667 (Colo.1988). To determine legislative intent, we look first to the words used in the statute. *People v. Warner,* 801 P.2d 1187, 1190 (Colo.1990).

In doing so, we note that neither section 125(2) nor 123(1) explicitly requires purchasers to claim that they relied on a defendant's "untrue statement" or omission of "material fact" to be entitled to relief. In the absence of such express language, we are unwilling to read into our statute such a pleading requirement. Hence, we conclude that a claim under section 11–51–125(2) is not lost where a plaintiff fails to allege direct reliance but

---

**7.** C.R.C.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *See also Fidelity Fin. Co. v. Groff,* 124 Colo. 223, 226, 235 P.2d 994, 996 (1951). Other than the issues here raised as to reliance, the parties do not dispute whether the particularity requirements of C.R.C.P. 9(b) were met by purchasers' complaint.

**8.** As Professor Louis Loss so elegantly stated more than a decade ago, "[t]he Securities Act of

1933 did not spring full grown from the brow of any New Deal Zeus. It followed a generation of state regulation...." Louis Loss, *Fundamentals of Securities Regulation* 1 (1983). It is not the state laws that are the progeny of the federal statutes. If anything, at least at the outset, Congress, the Federal Trade Commission, the first agency to administer the federal acts, and the Securities and Exchange Commission looked to the states, where "[s]ecurities regulation in this country began." *Id.* at 8. In addition, there is no federal analog to § 11–51–125(2).

sufficiently pleads causation. Moreover, even under federal rule 10b–5, adopted by the Securities and Exchange Commission pursuant to its authority under section 10(b) of the 1934 Securities Exchange Act,[9] the federal courts do not necessarily require direct proof of reliance. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988); *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *see also Bank of Denver v. Southeastern Capital Group, Inc.,* 763 F.Supp. 1552, 1557 (D.Colo.1991) ("My reading of the amended complaint reveals no allegation that the [plaintiff] obtained, read or used the official statement when it purchased the bonds. Such direct reliance is not necessarily fatal, however."); Krendl, *supra,* at 2172 n. 64.

■ The purpose of any reliance requirement is to "provide[ ] the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, Inc.,* 485 U.S. at 243, 108 S.Ct. at 989; *see also T.J. Raney,* 717 F.2d at 1332 ("[R]eliance is thus the causal nexus between the defendant's conduct and the plaintiff's injury."), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981) ("The element of reliance serves to restrict the potentially limitless thrust of rule 10b–5 to those situations in which there exists causation in fact between the defendant's act and the plaintiff's injury.") As two noted commentators have put it, "a reliance requirement is reasonable in a private action under Rule 10b–5, since the aim of the Rule 'is to qualify, as between [purchaser and seller], the doctrine of *caveat emptor*—not to establish a scheme of investors' insurance.'" 9 Louis Loss & Joel Seligman, *Securities Regulation* 4385 (3d ed. 1992) (footnote omitted).

In analyzing a private cause of action under section 125(2), the plain language utilized by our General Assembly is controlling. We therefore conclude that allegations of reliance *or* causation are necessary to support a cognizable claim. *See id.* at 4385–89.

In *Basic, Inc.,* 485 U.S. at 243, 108 S.Ct. at 989–90, Justice Blackmun, writing for the majority, stressed:

There is, however, more than one way to demonstrate the causal connection. Indeed, we previously have dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful con-

9. One commentator illustrated the modest beginning of Rule 10b–5:

I think it would be appropriate for me now to make a brief statement of what actually happened when 10b–5 was adopted, where it would be written down and be available to everybody, not just the people who are willing to listen to me.

It was one day in the year 1943, I believe. I was sitting in my office in the S.E.C. building in Philadelphia and I received a call form Jim Treanor who was then the Director of the Trading and Exchange Division. He said, "I have just been on the telephone with Paul Rowen," who was then the S.E.C. Regional Administrator in Boston, "and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4.00 a share, and he has been telling them that the company is doing very badly, whereas, in fact, the earnings are going to be quadrupled and will be $2.00 a share for this coming year. Is there anything we can do about it?" So he came upstairs and I called in my secre-

tary and I looked at Section 10(b) and I looked at Section 17, and I put them together, and the only discussion we had there was where "in connection with the purchase or sale" should be, and we decided it should be at the end.

We called the Commission and we got on the calendar, and I don't remember whether we got there that morning or after lunch. We passed a piece of paper around to all the commissioners. All the commissioners read the rule and they tossed it on the table, indicating approval. Nobody said anything except Sumner Pike who said, "Well," he said, "we are against fraud, aren't we?" That is how it happened.

Louis [Loss] is absolutely right that I never thought that twenty-odd years later it would be the biggest thing that had ever happened. It was intended to give the Commission power to deal with this problem. It had no relation in the Commission's contemplation to private proceedings.

Milton V. Freeman, *Conference on Codification of the Federal Securities Laws,* 22 Bus. Law. 793, 922 (1967).

duct had been established.... Similarly, we did not require proof that material omissions or misstatements in a proxy statement decisively affected voting, because the proxy solicitation itself ... served as an essential link in the transaction.... The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b–5's reliance requirement must encompass these differences.

Based on this rationale, purchasers' complaint need only allege reliance or causation.

However, in later stages of a proceeding, the admission of evidence regarding reliance or causation necessarily involves a factual inquiry into materiality. *See Goss v. Clutch Exch., Inc.,* 701 P.2d 33, 36 (Colo.1985) ("A misrepresented or omitted fact is considered material ... if there is a substantial likelihood that a reasonable investor would consider the matter important in making an investment decision."); CJI–Civ.3d 19:4 ("A fact is material if a reasonable person under the circumstances would attach importance to it in determining his or her course of action."). Actual proof of reliance or causation, which centers on materiality, is highly factual,[10] and the burden of going forward in some cases may shift to the defendant.[11]

■ Therefore, in order to state a claim pursuant to section 11–51–125(2), a plaintiff must allege the following: (1) that the plaintiff is a purchaser or seller of a security; (2) that the security is a "security"; (3) that the defendant acted with the requisite scienter; (4) that the defendant's conduct was in connection with the purchase or sale of a security; (5) that the defendant's conduct was in violation of section 11–51–123; and (6) that plaintiff relied upon defendant's conduct to his or her detriment, or that defendant's conduct caused plaintiff's injury. In this way, the Securities Act of 1981 does not become a form of investor insurance. Rather, it only sanctions behavior that has substantial effect on an investor's actions resulting in harm.

**B**

■ The purchasers' complaint sufficiently states a claim upon which relief may be granted to survive a C.R.C.P. 12(b)(5) motion. Within its four corners, the complaint asserts claims under section 11–51–125(2) asserting that "upon the offering of the 1986 Bonds plaintiffs were entitled to assume and rely upon ... [an] Official Statement [that] did not misstate a material fact or omit to state a fact necessary to make the statements therein not misleading." First Am. Class Action Compl. ¶ 53. In their complaint, purchasers' maintain: "By reason of such wrongful conduct, defendants are liable pursuant to C.R.S. §§ 11–51–123, 11–51–125(2) and 11–51–125(5)(b). As a direct and proximate result of their wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchase of the District's securities during the class period." *Id.* ¶ 69. Moreover, the very language utilized by purchasers in their complaint is taken directly from section 11–51–123. *See, e.g., id.* ¶¶ 63, 67.

■ At trial, when required to prove reliance or causation, a plaintiff must establish that a defendant's omission or misstatement was a substantial factor in determining the course of conduct that resulted in the plaintiff's loss. *T.J. Raney,* 717 F.2d at 1332. The United States Supreme Court has developed various presumptions in order to aid plaintiffs in their efforts to prove reliance under rule 10b–5. *See* 9 Loss & Seligman, *supra,* at 4392–93. For example, in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d

---

**10.** Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 13.5, at 97–98 (2d ed. 1990) ("As is the case with materiality, questions of reliance are highly factual and thus courts are properly reluctant to dismiss on the pleadings.")

**11.** *Panter v. Marshall Field & Co.,* 646 F.2d 271, 284 (7th Cir.) ("The *Mills–Ute* presumption [of reliance] is essentially a rule of judicial economy and convenience, designed to avoid the impracticality of requiring that each plaintiff shareholder testify concerning the reliance element."), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

741 (1972), the Court created a presumption of reliance where the defendant withheld material information from the plaintiff. *See also Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981) (stating that *Affiliated Ute* established a presumption that made it possible for plaintiffs to meet their burden of showing reliance), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). Likewise, the theory of fraud-created-the-market is another mechanism for shifting the burden of proving reliance from a plaintiff. Under the fraud-created-the-market theory, a court may presume that a plaintiff relied on the fundamental marketability of the security when the plaintiff purchased it. *Alter v. DBLKM, Inc.,* 840 F.Supp. 799, 804 (D.Colo. 1993).

These presumptions are evidentiary in nature and serve to place the burden of production on a particular party. *See* C.R.E. 301; CJI–Civ.3d 3:5, 3:5A. They serve as evidentiary constructs to facilitate a plaintiff's effort to prove reliance and causation. *See* 9 Loss & Seligman, *supra,* at 4392–93. Because they are procedural tools to delineate the evidentiary burdens of the parties at trial, they are not of consequence while considering motions under C.R.C.P. 12. It is not necessary to plead these theories or even to plead facts that would support such theories in a complaint. To sufficiently claim entitlement to relief under section 11–51–125(2) in a complaint, a plaintiff need only allege that a defendant made material misstatements or omissions that caused the plaintiff's harm.

In this case, purchasers sufficiently alleged facts to establish a claim under section 11–51–125(2). The purchasers alleged that the defendants conspired to and issued untrue statements and published or disseminated misleading statements in which they omitted material facts. First Am. Class Action Compl. ¶ 63. The purchasers further alleged that the defendants' misstatements and material omissions which created misleading statements, caused them financial harm. *Id.* ¶ 69.

Thus, although under a more fully developed record purchasers' case might not survive a motion for summary judgment, these allegations satisfy notice pleading require-

ments of our civil rules of procedure and are sufficient to overcome a motion pursuant to C.R.C.P. 12(b)(5).

### IV

#### A

The court of appeals concluded "that the *Affiliated Ute* rebuttable presumption of reliance is inapplicable here, because ... [purchasers'] complaint pleads primarily misstatements," not omissions. *Rosenthal,* 883 P.2d at 529. However, in *Affiliated Ute,* the Supreme Court premised its analysis on the relationship existing between a bank and its customers in face-to-face transactions which resulted in an obligation to disclose at the time the bank withheld or omitted to state material facts. *See Affiliated Ute,* 406 U.S. at 153, 92 S.Ct. at 1472 ("[D]efendants may not stand mute" in the face of a duty to disclose).

Here, the complaint alleges, among other things, that the purchasers acquired securities through market transactions involving the use of brokers, including defendant Dean Witter, which utilized a Sales Point Memorandum regarding the bonds.

In *Affiliated Ute,* in addition to omissions, the Supreme Court presumed reliance because of the "relationship of trust and confidence" between the bank and its customers. *Affiliated Ute* is totally inapplicable to the present case.

#### B

■ Assuming *Affiliated Ute* factually applied to the present case, we consider the court of appeals' misstatement/omissions dichotomy. The Supreme Court has held that "positive proof of reliance" is not a prerequisite to recovery in a securities fraud case involving a material omission of fact. *Affiliated Ute,* 406 U.S. at 153, 92 S.Ct. at 1472. "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Id.* at 153–54,

92 S.Ct. at 1472 (citations omitted). Some federal courts have held that *Affiliated Ute* applies only in "pure" omissions cases. *See, e.g., Cox v. Collins,* 7 F.3d 394, 395–96 (4th Cir.1993); *Grubb v. FDIC,* 868 F.2d 1151, 1163 (10th Cir.1989).

We recognize the difficulty in distinguishing between misstatements and omissions. Most misstatements could be characterized as either half-truths or half-omissions. *See Little v. First Cal. Co.,* 532 F.2d 1302, 1305 n. 4 (9th Cir.1976) "The categories of 'omission' and 'misrepresentation' are not mutually exclusive. All misrepresentations are also non-disclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true." *Id.*

A case of pure omissions is difficult to imagine, and even the facts of *Affiliated Ute* involved *"primarily* a failure to disclose," 406 U.S. at 153, 92 S.Ct. at 1472 (emphasis added), not *only* a failure to disclose. *See Gruber v. Price Waterhouse,* 776 F.Supp. 1044, 1050 (E.D.Pa.1991). "The labels by themselves, therefore, are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute,* in which no positive statements exist: reliance as a practical matter is impossible to prove." *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 93 (2d Cir.1981).[12]

The plain language of our statutes, however, draws no distinction between a person who "make[s] any untrue statement of a material fact," versus one who "omit[s] to state a material fact necessary in order to make the statements made ... not misleading." § 11–51–123(1)(b). Therefore, we refuse to recognize a misstatements/omissions dichotomy and disapprove of any reading of the Securities Act of 1981 that results in such a practice.

Because we conclude that the complaint sufficiently sets forth a claim under section 11–51–125(2), we do not reach the question addressed by the court of appeals as to whether the fraud-created-the-market doctrine should be imported into Colorado law. However, to the extent the court of appeals' opinion is read to assume that that doctrine is a part of our law, we disapprove of that opinion.

## V

The district court denied class certification based, in part, upon its holding that Rosenthal had no standing to assert a claim under the Securities Act of 1981 because he purchased the bonds in Pennsylvania. The court of appeals held that "there is a transactional nexus between Rosenthal and Colorado" because the defendants issued the Official Statement in Colorado and thereby

**12.** Nonetheless we note that the complaint frequently refers to omissions or failures to disclose material facts. *See, e.g.,* First Am. Class Action Compl. ¶ 9 ("Defendant Dean Witter directly assisted in the ... wrongs complained of herein by failing to disclose the material facts as alleged herein...."); *id.* ¶ 10 ("[Defendant] Kutak directly assisted in the ... wrongs complained of herein by failing to disclose the material facts as alleged herein...."); *id.* ¶ 11 ("[Defendant] Sherman directly assisted in the ... wrongs complained of herein by failing to disclose the material facts alleged herein...."); *id.* ¶ 12 ("[Defendant] Calkins directly assisted in the ... wrongs complained of herein by failing to disclose the material facts as alleged herein...."); *id.* ¶ 17 ("The Individual Defendants ... were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature."); *id.* ¶ 23 ("Each of the defendants either knew or recklessly disregarded the fact that the ... misleading state-

ments and omissions described herein would adversely affect the integrity of the market...."); *id.* ¶ 63 ("[T]he defendants issued material misstatements and information which they knew or had reason to know were false and misleading, and omitted to state material facts necessary to make those statements not misleading."); *id.* ("The false and misleading statements of material facts to the District's bondholders and to the investment community, and the material facts which defendants failed or omitted to disclose, related to the prospects and risks of the District and include the following...."); *id.* ¶ 66 ("[T]he true nature of the risk to which payment on the 1986 Bonds would be subjected was concealed from the plaintiffs...."); *id.* ¶ 67 ("[Defendants] made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading....").

created an offer to sell. *Rosenthal,* 883 P.2d at 530.[13] We agree.

The Securities Act of 1981 provides: "Sections 11–51–105, 11–51–107, 11–51–116, 11–51–123, and 11–51–125 apply to persons who sell or offer to sell when an offer to sell is made in this state or when an offer to buy is made and accepted in this state." § 11–51–127(1), 4B C.R.S. (1987), *repealed by* ch. 82, sec. 1, §§ 11–51–101 to –802, 1990 Colo. Sess. Laws 700, *and recodified as amended at* § 11–51–102(1), 4B C.R.S. (1995 Supp.). " 'Sale' or 'sell' includes every contract of sale of, contract to sell, or disposition of a security or interest in a security for value," and an " '[o]ffer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." § 11–51–102(10)(a)–(b), 4B C.R.S. (1987), *repealed by* ch. 82, sec. 1, §§ 11–51–101 to –802, 1990 Colo. Sess. Laws 700, *and recodified as amended at* § 11–51–201(13)(a), 4B C.R.S. (1995 Supp.).

The district court relied on *Simms Investment Co. v. E.F. Hutton & Co.,* 699 F.Supp. 543 (M.D.N.C.1988), which interpreted Colorado law and stated: "Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by exposing illegitimate resident issuers to liability, without regard to the markets of the issuer." *Id.* at 545. We agree.

The court in *Simms* also stated: "There are three jurisdictional requirements for invoking the Colorado Blue Sky laws. First, there must be an 'offer' or 'sale.' Second, the transaction must involve a 'security.' Finally, the transaction must take place within the state." *Id.* at 546. The district court in this case concluded that the events surrounding the offer and sale of bonds to Rosenthal occurred in Pennsylvania and that, therefore, Colorado law did not apply. The court of appeals disagreed with this reading of *Simms,* pointing out that the *Simms* court ultimately concluded that the transaction had a sufficient territorial nexus with Colorado because the plaintiff had alleged "that the offer, acceptance, or both ... occurred in Colorado." *Rosenthal,* 883 P.2d at 530 (citation and internal quotation marks omitted). The court of appeals concluded that the *Simms* requirement that "the transaction must take place in Colorado" referred to either the offer or the sale. *Id.* at 531. In the context of a suit against either a Colorado offeror or those who assisted the offeror in making that offer, we agree. *See* § 11–51–127(1).

■ We agree and hold that the Securities Act of 1981 expressly applies to "every attempt or offer to dispose of, or solicitation of an offer to buy," a security for value when that offer is made within Colorado. §§ 11–51–102(10)(b), 11–51–127(1); *see Raymond Lee Org., Inc. v. Securities Comm'n,* 36 Colo. App. 417, 425, 543 P.2d 75, 80 (1975), *rev'd on other grounds,* 192 Colo. 112, 556 P.2d 1209 (1976). Under this language, a sufficient transactional nexus exists between Rosenthal and Colorado to sustain the application of the Securities Act of 1981. The District, located in Colorado, issued the bonds.[14] The District, with the defendants' assistance, prepared the Official Statement, wherein the purchasers allege fraud. Accordingly, we conclude that the plain language of section 11–51–127(1) controls and that Rosenthal has standing to bring a claim under Colorado law. The district court must reconsider the issue of class certification before considering any remaining claims.

---

13. The court of appeals also reversed the district court's holding which barred the Bettmanns from suing as class representatives. *Rosenthal,* 883 P.2d at 531–32. This holding is not an issue for review on this certiorari. Likewise, the sufficiency of the purchasers' conspiracy claims is not before us.

14. Although the District is not a defendant because of its bankruptcy, the purchasers' complaint alleges conspiracy between the District and the other defendants. Thus, the defendants' participation in the distribution to prospective investors in Colorado of the Official Statement subjects the defendants to the application of the Securities Act of 1981.

The defendants argue that the offer to sell to Rosenthal came from Dean Witter in Pennsylvania and not from the defendants in Colorado. Dean Witter's role as a broker or dealer of the District's securities does not affect the offer's origin.

## VI

We reverse the court of appeals' determination that the purchasers have not sufficiently pleaded their claims for violations under sections 11–51–123(1) and 11–51–125(2) of the Securities Act of 1981. Because it unnecessarily addressed the doctrine of fraud-created-the-market, we disapprove of the court of appeals' holding that the doctrine is imported into Colorado law. We affirm the court of appeals' determination that Colorado law governs Rosenthal's claims against the defendants in this case. We return this case to the court of appeals with instructions to remand to the district court for further proceedings consistent with this opinion.

ERICKSON, J., concurs in part and dissents in part, and VOLLACK, C.J., joins in the concurrence and dissent.

Justice ERICKSON concurring in part and dissenting in part:

I agree with the majority that the Colorado Securities Act applies to Howard Rosenthal's claims. I also agree that, on this record, the presumption of reliance in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), is inapplicable, and that this court need not address the availability of the doctrine of fraud-created-the-market. However, I disagree with three of the majority's conclusions: (1) that the question of the necessity of pleading reliance under the Colorado Securities Act is properly before this court; (2) that the court cannot appropriately consider evidentiary presumptions at this stage of the proceedings; and (3) that the purchasers have alleged sufficient facts to sustain their claims under sections 11–51–123 and 11–51–125(2) of the Colorado Securities Act. §§ 11–51–123 and 11–51–125(2), 4B C.R.S. (1987), *repealed*

by ch. 82, sec. 1, §§ 11–51–101 to –802, 1990 Colo. Sess. Laws 700, *and recodified as amended at* §§ 11–51–501 and 11–51–604, 4B C.R.S. (1995 Supp.). Accordingly, I dissent.

## I

The majority opinion centers on whether a plaintiff must plead reliance to establish a claim under sections 11–51–123 and 11–51–125(2) of the Colorado Securities Act. This issue is not properly before us on this certiorari.[1] In their petition for writ of certiorari, the purchasers did not challenge *whether* reliance was required, but whether reliance could be *presumed* in this case. The Colorado Securities Commissioner, acting as amicus, argued that "*there is no express statutory requirement under § 123(1) of the 1981 Act that reliance be pleaded or proven.*" The purchasers subsequently adopted this argument in a footnote to their response brief. It is improper for this court to consider new issues introduced by amici. *Farmers' Union Ditch Co. v. Rio Grande Canal Co.*, 37 Colo. 512, 522, 86 P. 1042, 1045 (1906). *Accord Moffat Tunnel Improvement Dist. v. Denver & S.L. Ry. Co.*, 45 F.2d 715, 722 (1930), *cert. denied*, 283 U.S. 837, 51 S.Ct. 485, 75 L.Ed. 1448 (1931); *Eugene Cervi & Co. v. Russell*, 31 Colo.App. 525, 530, 506 P.2d 748, 751 (1972), *aff'd*, 184 Colo. 282, 519 P.2d 1189 (1974). By deciding the necessity of pleading reliance in an action under the Colorado Securities Act, the majority skirts the issues raised by the parties and addresses only a new issue interjected by the amicus brief.

## II

As stated by the majority, we view with disfavor a C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim, *Dunlap v. Colorado Springs Cablevision, Inc.*, 829 P.2d 1286, 1291 (Colo.1992), and uphold a district court's

---

1. The issues on which we granted certiorari are: Whether the court of appeals erred by affirming the district court's dismissal of the fraud claims of municipal bond purchasers by improperly interpreting the pleading requirements of section 11–51–123 of the Colorado Securities Act, §§ 11–51–101 to –908, 4B C.R.S. (1987 & 1994 Supp.).
Whether the court of appeals erred in adopting the fraud-created-the-market doctrine as a sub-

stitute for pleading actual reliance under the anti-fraud provisions of the Colorado Securities Act of 1981, § 11–51–123, 4B C.R.S. (1987 & 1994 Supp.).
Whether the Colorado Securities Act of 1981, as set forth in § 11–51–127(1), 4B C.R.S. (1987 & 1994 Supp.), applies to a securities purchase when both the offer and sale take place outside of the state of Colorado.

grant of such a motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [2] *Id.* (citation and internal quotation marks omitted). *See* maj. op. at 1099. However, where "matters outside the pleading are presented to and not excluded by the court, the [12(b)(5)] motion shall be treated as one for summary judgment." C.R.C.P. 12(b); *Alexander v. Morrison–Knudsen Co.,* 166 Colo. 118, 444 P.2d 397 (1968), *cert. denied,* 393 U.S. 1063, 89 S.Ct. 715, 21 L.Ed.2d 706 (1969). Here the record contains "matters outside the pleading," including the Official Statement and deposition excerpts in which Rosenthal admits he did not directly rely on the Official Statement. Thus, the defendants' motions should be treated as motions for summary judgment.

A motion for summary judgment is properly granted "when the pleadings, affidavits, depositions, or admissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Civil Serv. Comm'n v. Pinder,* 812 P.2d 645, 649 (Colo.1991). *See* C.R.C.P. 56(c). The movant must carry the burden of establishing the nonexistence of a genuine issue of material fact, *Pinder,* 812 P.2d at 649, and "may satisfy this burden by demonstrating that there is an absence of evidence in the record to support the non-moving party's case." *Id.; see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (holding that, when the nonmovant bears the burden of proof at trial, summary judgment is warranted if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to [its] case"). The "wholesome utility" of a motion for summary judgment "is, in advance of trial, to test, not as formerly on bare contentions found in the legal jargon of pleadings, but on the intrinsic merits, whether there is in actuality a real basis for relief or defense." *Sullivan v. Davis,* 172 Colo. 490, 496, 474 P.2d 218, 221 (1970) (citation and internal quotation marks omitted). Unlike rule 12(b), rule 56 does not

presume "that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990).

As discussed in Part IV of this dissent, the defendants here have pointed to an absence of evidence in the record to support the purchasers' case under sections 11–51–123 and 11–51–125(2) of the Colorado Securities Act, and the purchasers have failed to establish a real basis for relief. Consequently, the motions for summary judgment should be granted.

### III

This court may appropriately consider evidentiary presumptions at this stage of the proceedings. The majority correctly states that presumptions are "procedural tools to delineate the evidentiary burdens of the parties at trial." *See* maj. op. at 1103. However, evidentiary standards at trial and evidence to be considered on a motion for summary judgment are not so easily severed.

> [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in

---

**2.** Pursuant to C.R.C.P. 54(b), the district court directed the entry of a final judgment on the C.R.C.P. 12(b)(5) dismissal and on the order de-

nying class certification. The court's action under rule 54 enabled the purchasers to obtain appellate review without delay.

fact provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Contrary to the majority's conclusion, an evidentiary presumption may be determinative of a pre-trial motion. *See, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988) (allowing a presumption of reliance for a pre-trial class certification motion). *See also Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (affirming a grant of summary judgment based upon a conclusive presumption of paternity). The presumption of reliance, if invoked, is rebuttable and "subject on remand to such adjustment, if any, as developing circumstances demand." *Basic,* 485 U.S. at 250, 108 S.Ct. at 993.

## IV

In any event, I disagree with the majority's conclusion that the purchasers need plead only "that a defendant made material misstatements or omissions that caused the plaintiff's harm" to sustain their claims under sections 11–51–123 and 11–51–125(2) of the Colorado Securities Act. *See* maj. op. at 1103. To be entitled to relief, the purchasers must establish reliance on the defendants' statements or material omissions as an element of their private claims under sections 11–51–123 and 11–51–125(2). *See Boettcher & Co. v. Munson,* 854 P.2d 199, 208 (Colo. 1993).[3]

Traditionally, a private action for damages under rule 10b–5 is predicated on a plaintiff's direct reliance on a defendant's misrepresentations or material omissions. A plaintiff proves reliance by showing that "the misrepresentation is a substantial factor in determining the course of conduct which results in ... loss." *T.J. Raney & Sons v. Fort Cobb, Okla. Irrigation Fuel Auth.,* 717 F.2d 1330, 1332 (10th Cir.1983) (citation and internal quotation marks omitted), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984).

Proof of reliance demonstrates the causal connection between a defendant's fraud and a plaintiff's loss. *See id.; In re Storage Technology Corp. Sec. Litig.,* 630 F.Supp. 1072, 1077 (D.Colo.1986) (citing *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)) (discussing reliance required under rule 10b–5); Cathy Stricklin Krendl, *The Securities Act of 1981: A Reduction in Duplicate Regulation,* 10 Colo. Law. 2158, 2170–71 (Sept. 1981). The majority holds that "allegations of reliance *or* causation are necessary to support a cognizable claim." Maj. op. at 1101–1102. I disagree and conclude that allegations of direct or presumed reliance are necessary to satisfy the threshold level of causation which, in turn, is necessary to support a cognizable claim. That is, the purchasers must allege that their reliance on the defendant's misrepresentations *caused* the purchasers to suffer a financial loss. *See* §§ 11–51–123, –125(2). *Cf.* 3 Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 101.02 (4th ed. 1987).[4]

The United States Supreme Court has held that "positive proof of reliance" is not a prerequisite to recovery in a securities fraud case. *Affiliated Ute,* 406 U.S. at 153, 92 S.Ct. at 1472. However, that court has approved only two theories of presumptive reliance: (1) presumed reliance on material omissions, *id.;* and (2) presumed reliance

---

**3.** Although section 11–51–123(1) does not explicitly require reliance, we have held that that section parallels federal rule 10b–5. *See Boettcher,* 854 P.2d at 208; *People v. Riley,* 708 P.2d 1359, 1363 (Colo.1985). Rule 10b–5 requires reliance. *See O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 897 (10th Cir.1992).

**4.** The federal instruction lists the essential elements of a 10b–5 claim: (1) that the defendant used an instrumentality of interstate commerce or a facility of a national securities exchange; (2) that the defendant either employed a device, scheme, or artifice to defraud; or misrepresented a material fact or omitted to state a material fact necessary in order to make the statements which were made not misleading, in light of the circumstances; or engaged in a fraud or deceit in connection with the sale or purchase of a security; (3) that the defendant acted knowingly; (4) that the plaintiff justifiably relied upon the defendant's conduct; and (5) that the plaintiff suffered damages as a result of the defendant's conduct. Devitt, *supra* § 101.02.

under the doctrine of fraud-on-the-market.[5] *See Basic*, 485 U.S. at 243, 108 S.Ct. at 989. Some federal courts have approved the doctrine of fraud-created-the-market as a third theory of presumptive reliance.[6] *See, e.g., T.J. Raney*, 717 F.2d 1330. All three theories are theories of presumed *reliance*, not of presumed or actual causation.

On the record before us, the purchasers admittedly did not read the Official Statement and, thus, cannot allege or prove direct reliance. Absent direct reliance, the purchasers must allege and prove facts sufficient to allow a presumption of reliance.

I agree with the majority that the presumption of "*Affiliated Ute* is totally inapplicable to the present case." Maj. op. at 1103. The purchasers do not raise the doctrine of fraud-on-the-market. Finally, as discussed below, the purchasers have not alleged or otherwise proven sufficient facts to invoke the presumption of fraud-created-the-market, even were we to hold that theory applicable.

To invoke the presumption of fraud-created-the-market, the purchasers must allege all of its various elements. *See Basic*, 485 U.S. at 248 n. 27, 108 S.Ct. at 993 n. 27 (holding that in order to invoke the presumption of fraud-*on*-the-market for a pre-trial motion, the plaintiff must allege: "(1) that the defendant made public misrepresentations; (2)

that the misrepresentations were material," i.e., that they would "induce a reasonable, relying investor to misjudge the value of the shares;" "(3) that the shares were traded on an efficient market;" and (4) "that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed.").

The elements of fraud-created-the-market include, at a minimum, the legal or economic unmarketability of the securities at issue. *See Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1159–60 (6th Cir.1994).[7] This action simply cannot withstand a motion for summary judgment based on the presumption of fraud-created-the-market. The complaint at hand does not sufficiently allege the unmarketability of the bonds, nor does the record establish that unmarketability. Rather, the complaint alleges that "[d]efendants had a duty to promptly disseminate accurate and truthful information ... so that the *market price* of the District's 1986 Bonds would be based on truthful and accurate information." First Am. Class Action Compl. ¶ 24. The complaint also alleges that the purpose and effect of the Official Statement was:

(i) to market otherwise unmarketable bonds, inflate the price of the 1986 Bonds and to conceal the adverse facts concern-

---

**5.** Fraud-on-the-market creates a rebuttable presumption of reliance based on the theory that the price of a security in an open and developed market is determined by all available, material information, misinformation, and omissions. *Basic*, 485 U.S. at 241–47, 108 S.Ct. at 988–92. "Accordingly, [under the fraud-on-the-market theory,] any fraudulent misrepresentation or omission will taint the price to the damage of buyers or sellers regardless of their personal knowledge or reliance." *Alter v. DBLKM, Inc.*, 840 F.Supp. 799, 804 (D.Colo.1993).

**6.** The doctrine of fraud-created-the-market "is based on the theory that investors rely not on the integrity of the market price, but on the integrity of the market itself." *Alter*, 840 F.Supp. at 805. Consequently, the doctrine holds that investors "should be able to rely on the fact that local governments would not authorize, underwriters would not finance and brokers would not offer to sell bonds they knew were unmarketable." *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1159–60 (6th Cir.1994). As articulated by the Fifth Circuit in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722,

74 L.Ed.2d 949 (1983), the doctrine of fraud-created-the-market requires that the plaintiff establish "that (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [the plaintiff] reasonably relied on the [securities'] availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud [the plaintiff] suffered a loss." *Id.* at 469–70 (footnote omitted), *quoted in T.J. Raney*, 717 F.2d at 1332.

**7.** A security is economically unmarketable "if no investor would buy it because, assuming full disclosure, the security is patently worthless." *See Ockerman*, 27 F.3d at 1160. A "security is *legally unmarketable* if, absent fraud, a regulatory agency or the issuing municipality would have been required by law to prevent or forbid the issuance of the security." *Id.* If the plaintiff "proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover." *Shores*, 647 F.2d at 470.

ing the risks to which payments would be subjected, and (ii) to maintain an artificially high market price for the 1986 Bonds by concealing the true nature of the risk to which the payment would be subjected.

*Id.* ¶ 66. Although the purchasers' complaint uses the term "unmarketable," the substance of their complaint involves the *market value* of the bonds, not their *marketability*. Likewise, the record in this case fails to reveal the economic unmarketability of the bonds.

Further, the purchasers do not allege and the record does not reveal legal unmarketability, i.e., that "defendants made misrepresentations or omissions to the issuing municipality or to a regulatory agency such that, had full disclosure been made, the governmental entity would have been required by law to deny the bonds' issuance." *See Ockerman,* 27 F.3d at 1160; *T.J. Raney,* 717 F.2d at 1333.

The defendants are entitled to summary judgment on this record because they have pointed to the absence of evidence in the record to support reliance on the part of the purchasers and because the purchasers have failed to demonstrate either that a genuine issue of material fact precludes the entry of summary judgment or that a real basis for relief exists. Thus, I respectfully dissent from that portion of the majority's opinion which allows the purchasers' claims under sections 11–51–123 and 11–51–125(2) of the Colorado Securities Act to proceed on the allegations made in the purchasers' first amended class action complaint. On the record before us, I would affirm the entry of judgment for the defendants.

I am authorized to say that Chief Justice VOLLACK joins in this concurrence and dissent.

